# Exhibit 4

# Transcript of April 11, 2005 EEO Hearing

| Witness | Pages |
|---|---|
| Plaintiff | 13, 18-20, 24-25, 48-55, 64-66, 68-70 |
| Cynthia Schwimer | 86, 91-101, 113-114 |
| Michael Williams | 121, 127-138, 143-144 |
| Joanne Suttington | 146-150 |

BEFORE THE
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

```
- - - - - - - - - - - - - - - - x
                                :
ADA GONZALES,                   :
                                :
           Complainant,         :  EEOC No. 100-
                                :    2003-08223X
      v.                        :
                                :  Agency No.
ALBERTO GONZALEZ, ATTORNEY      :    JP-0203
GENERAL, DEPARTMENT OF JUSTICE, :
                                :
           Agency.              :
- - - - - - - - - - - - - - - - x
```

EEOC Washington Field Office
Suite 200
1400 L St., N.W.
Washington, D.C.  20005

Monday, April 11, 2005

THE HEARING in the above-entitled matter

commenced at 9:15 a.m., pursuant to notice.

BEFORE:

GLADYS COLLAZO, Administrative Law Judge

**Diversified Reporting Services, Inc.**
1101 Sixteenth Street, NW Second Floor
Washington, DC  20036
(202) 467-9200

2

APPEARANCES:

    On Behalf of Complainant:

        MICHAEL J. KATOR, ESQ.
        SHANA N. BECKER, ESQ.
        Kator, Parks & Weiser, PLLC
        1020 19th Street, N.W., Suite 350
        Washington, D.C.  20036
        (202) 898-4800


    On Behalf of Agency:

        JASON P. COOLEY, ESQ.
        MARIE E. BURKE, ESQ.
        Office of the General Counsel
        Office of Justice Programs
        810 Seventh Street, Fifth Floor
        Washington, D.C.  20531


    Also Present:

        Ingrid Sausjord, Esq., Department of Justice
        Rafael Alberto Madan, Esq., Department of
          Justice
        Jessica Mols, Law Clerk/Intern
        Rosemary Carradini (Agency/training)
        Phillip Merkle (Agency/training)

3

# C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Ada Gonzales | 13 | 48 | 71 | -- |
| Patricia Cuffee | 73 | 82 | -- | -- |
| Cynthia Schwimer | 86 | 107 | -- | -- |
| Michael Williams | 121 | 136 | 143 | -- |
| Joanne Suttington (via telephone) | 146 | 151 | 152 | -- |
| Andrea McIntosh | 154 | 157 | -- | -- |

COMPLAINANT'S EXHIBITS:          MARKED          RECEIVED

(None.)

AGENCY EXHIBITS:

1 - Schwimer email, 5/17/02      120             120

JOINT EXHIBITS:

(None.)

**Diversified Reporting Services, Inc.**
1101 Sixteenth Street, NW  Second Floor
Washington, DC  20036
(202) 467-9200

1          MR. KATOR:  Thank you, Judge.  We'll call Ms.

2    Gonzales, and Ms. Becker will examine.

3          Is it okay if we just proceed from here or do

4    prefer we use the podium?

5          JUDGE COLLAZO:  It's up to you.  As long as

6    she can hear.

7          MR. KATOR:  Okay.  Thank you, Judge.

8          JUDGE COLLAZO:  Good morning, Ms. Gonzales.

9          MS. GONZALES:  Good morning.

10          JUDGE COLLAZO:  I'm going to swear you in.

11    Whereupon,

12                     ADA GONZALES,

13    was called as a witness and, having been first duly

14    sworn, was examined and testified as follows:

15          JUDGE COLLAZO:  Mr. Kator?

16                DIRECT EXAMINATION

17          BY MS. BECKER:

18      Q    Good morning, Ms. Gonzales.

19      A    Good morning.

20          JUDGE COLLAZO:  Sorry -- Ms. Becker.

21          MS. BECKER:  That's okay.

22          BY MS. BECKER:

1        Q    And you --

2             JUDGE COLLAZO:  For how long did you act in

3    that position?

4             THE WITNESS:  It was from August 2nd of 2000

5    to, I believe, November 20th of 2000.

6             JUDGE COLLAZO:  November?

7             THE WITNESS:  November 20th of 2000.  As a

8    matter of fact, I was actually promoted to grade 15 for

9    that period.

10            BY MS. BECKER:

11       Q    What --

12            JUDGE COLLAZO:  Hold on.  August 2nd, 2000 to

13   November 20th, 2000?

14            THE WITNESS:  Yes, ma'am.

15            JUDGE COLLAZO:  Okay.

16            BY MS. BECKER:

17       Q    What were some of your major accomplishments

18   while you were serving as the acting division director?

19       A    As a division director, I was in charge of the

20   training and policy section of the division and the

21   customer service center, as well as the control desk,

22   and I believe we had 50 or so employees, including

1    Federal employees and contractor personnel.  And in the

2    training and policy area, we had a number of projects

3    that we accomplished.  A lot of these projects really

4    took place in the fall, that were in process in the

5    fall, and that was the period that I was acting, August

6    through November.

7         And we had the financial management seminar

8    scheduling preparations to -- for the training program

9    that would take place in the following calendar year.

10   And that involved working with consultants,

11   contractors, working with the procurement office to

12   secure hotels, venues, make all kinds of logistical

13   arrangements for about 24 -- 22, 24 financial

14   management training seminars nationwide, where we

15   provide training in financial management on Federal

16   grants to grant recipients around the country.

17        We also were working on a number of policies

18   and procedures, because that's what we -- the Training

19   and Policy Division is responsible for, developing

20   policies and procedures for the Office of the

21   Comptroller.

22        And I was also the point of contact, the

1   Office of the Comptroller point of contact to the

2   Office of General Counsel to work on agency-wide

3   policies and procedures.  So, it was a large number of

4   documents and procedures that we were working at the

5   time in policies.

6          We were also working on the briefing book,

7   which is a report that the comptroller -- you know --

8   we put together, and my division was in charge of

9   putting it together, basically research and gathering

10  data from other divisions and other sources to give the

11  assistant attorney general a briefing of the financial

12  achievements of the prior year.

13         We also were working on divisions to the

14  financial guide.  The financial guide is a large

15  document that spells out all of the rules and

16  regulations for the management of Federal grants.

17         We were working on a newsletter that used to

18  be quarterly, then semi-annually.  We no longer -- or

19  they no longer do it, actually.

20         We also -- I believe that was the first year

21  we started working on what we called the state of work

22  project, and that was a massive project that we prepare

1   Smythe, who was a special assistant to Cindy Schwimer,

2   and I wanted to be sure that, you know, we were doing

3   the right thing.   And I spoke with Jim and with Maureen

4   and they both agreed with the fact that we could not

5   let Michael go.

6           And so then I said to Mike that he could go if

7   he could trade, if he could work out an arrangement

8   with another employee who was already scheduled to be

9   off and if he could trade with another employee.

10      Q    So you told me he could have leave if he could

11   find someone else to work in his shift?

12      A    Yes.

13      Q    And then what happened?

14      A    I was called by the comptroller to her office,

15   and she spoke to me and said that Michael had come to

16   her about the day off and that I was to -- I was

17   telling him that he couldn't have the day off.

18      Q    And did she ask you why you had denied him the

19   day off?

20      A    The whole conversation -- if I can call it a

21   conversation; she really was the only one that spoke --

22   it was so quick.   She was standing, I walked in, there

25

1  were some people in her office, Jim McKay, Maureen

2  Smythe and Elliot Brown.  Elliot Brown is her executive

3  -- the comptroller's executive assistant.  And when I

4  walked in, she started talking almost immediately, and

5  only said about two or three sentences, I recall.

6          But as I walked in, Maureen Smythe and Jim

7  McKay immediately kind of almost walked around me as I

8  was kind of coming in the door, or standing near the

9  door, and left without saying anything.

10     Q     Did they tell you -- they didn't tell you or

11 tell her that you had talked to them about Cynthia

12 Gaines' decision to deny leave?

13     A     No.

14     Q     And you are saying that you didn't say -- she

15 didn't give you an opportunity to explain --

16     A     Well, as I started to talk, almost in mid-

17 sentence -- I don't even remember how many words I may

18 have gotten out -- she said, I have to leave.  She was

19 already standing when I walked in, and she grabbed a

20 folder from her desk and she said, I have a meeting,

21 and she left.  And I didn't get a chance to say

22 anything, really.

48

1      Q    Has it affected you physically in any way?

2      A    Well, physically, emotionally, I actually --

3  my blood pressure, and I ended up going to the hospital

4  with chest pains at one point in October of -- October

5  of 2003, I think it was, yes.

6      Q    And you believe that was related to the stress

7  you're experiencing?

8      A    Yes, yes.

9      Q    As a result of the non-selection?

10     A    I believe so.  I believe so.  And also, you

11  know, subsequent to Ms. Suttington being selected, the

12  treatment that I was subjected to.  I mean, it had been

13  a very difficult environment, and I know that it was a

14  hostile environment all along, and it didn't get any

15  easier working under Ms. Suttington after she was

16  selected.

17     Q    Thank you, Ms. Gonzales.

18     MS. BECKER:  No more questions.

19     JUDGE COLLAZO:  Cross?

20                   CROSS EXAMINATION

21     BY MS. BURKE:

22     Q    Ms. Gonzales, you mentioned some documents

1    that you had worked on while you were acting director

2    of the Training and Policy Division in August to

3    November 2000.  You mentioned the briefing book and the

4    financial guide?

5         A    Yes.

6         Q    Those were two documents that had existed

7    previously and were just being revised, is that right?

8         A    Yes.

9         Q    And a number of individuals worked on those

10   documents; it was a collective office effort?

11        A    Well, I was responsible for everything that

12   went on in the division, and I made assignments and I

13   oversaw and made sure that deadlines were met and that,

14   you know, the quality of the work product -- yes.  And

15   I'm trying to remember if that year was a complete

16   revision of the guide, because we do semi-annual

17   revisions which we call change set, and they're just

18   sort of partial revisions.

19             But then like once a year, or sometime we may

20   go 18 months, and we do the entire guide.  And I'm

21   trying to remember if that year was the entire guide or

22   not, and I couldn't be sure unless I really check.

50

1      Q    And were there drafts that were prepared and

2   reviewed by several individuals?

3      A    Well, the supervisor that reported to me,

4   Cynthia Gaines and I worked on -- yes.

5      Q    And the financial guide is worked on by

6   different divisions within the Office of the

7   Comptroller, isn't it?

8      A    No.  We do the research, we gather data, we

9   put it together.

10      Q    Did you have input from other divisions?

11      A    Uhh --

12      Q    Would other division directors have reviewed

13   the drafts as well?

14      A    I don't -- they -- if we were revising a

15   section that pertains to a particular division, equally

16   the Office of General Counsel, there was one year that

17   we did the whole legislative authority section, and we

18   worked with the Office of General Counsel for that

19   section.

20             But we get input from other divisions.  The

21   other divisions don't review the entire guide, I don't

22   believe.

51

1     Q    Okay.  You testified earlier that you had

2    applied for the position of TPD director in 2000?

3    A    Yes.

4    Q    You were interviewed at that time, were you

5    not?

6    A    Yes.

7    Q    Were you interviewed by a panel of three

8    individuals?

9    A    Yes.

10    Q    And that panel consisted of Jim McKay, Maureen

11    Smythe and Larry Hailes?

12    A    Yes.

13    Q    Okay.  You were not selected for that position

14    in the fall of 2000, is that right?

15    A    That is right.

16    Q    Okay.  Cindy Schwimer was the selecting

17    official at that time?

18    A    Yes.

19    Q    Okay.

20    JUDGE COLLAZO:  I'm sorry.  Who?

21    MS. BURKE:  Cindy Schwimer.  Cynthia Schwimer,

22    the comptroller.

**Diversified Reporting Services, Inc.**
1101 Sixteenth Street, NW  Second Floor
Washington, DC  20036
(202) 467-9200

52

1          BY MS. BURKE:

2          Q    At the time of that selection in the fall of

3     2000, you had not been involved in any prior EEO

4     activity, is that right?

5          A    No.

6          Q    Okay.  In fact your first EEO activity was

7     February of 2002?

8          A    Yes.

9          Q    Okay.  When you applied again in 2002 and were

10    not selected by Cindy Schwimer, you thought that you

11    were the best qualified applicant?

12         A    Yes.  I knew I was.

13         Q    So you disagree with how Cindy Schwimer

14    assessed your abilities?

15         A    Yes.

16         Q    Okay.  That wasn't the first time that you

17    disagreed with how management assessed your abilities,

18    is that right?

19         A    Well, when I was not selected in 2000, I was

20    utterly disappointed and didn't know what to think,

21    because I was in the position, I was acting division

22    director, and the position had been announced, we had

1   gone through the process.  Mr. McCrory was already a

2   division director 15.  He could have applied; he did

3   not.  He did not go through the process, and then he

4   was brought in, in my estimation, you know, as they

5   say, through the back door, and the division -- the

6   comptroller called it a rotation.

7        Q    You've disagreed over time with several

8   different evaluations of your performance by

9   management, is that right?

10       A    Starting with Mr. McCrory, yes.

11       Q    When Mr. McCrory evaluated you in 2001, the

12  system was essentially pass/fail?

13       A    Yes.

14       Q    Okay.  Or there were two categories, results

15  achieved and then unsatisfactory?

16       A    Yes.

17       Q    And he gave you results achieved in every

18  category?

19       A    Yes.

20       Q    Okay.  You testified earlier that you thought

21  that he had not given you sufficient comments in the

22  comments section.  But you don't know for a fact that

54

1    it was his custom to give comments at all for other

2    evaluations, is that right?

3         A    I was concerned as to the minimal nature of

4    the comments for me.

5         Q    But you don't know whether it was his custom

6    to give -- what comments he gave for other individuals,

7    either, do you?

8         A    I was --

9              MS. BECKER:  Object --

10             THE WITNESS:  I was concerned about his

11   comments about me.

12             JUDGE COLLAZO:  Hold on a second.  There's an

13   objection.

14             MS. BECKER:  Objection, irrelevant.  I'm not

15   sure why whether he made comments or not has anything

16   to do with the non-selection.

17             MS. BURKE:  Well, she's arguing that his

18   comments --

19             JUDGE COLLAZO:  Well, you opened it.  You

20   asked her about it.  I will allow it.

21             MS. BURKE:  Thank you, Judge.

22             BY MS. BURKE:

1    Q    Again, so, supervisors have a choice of simply

2  rating an individual, results achieved/unsatisfactory,

3  and then a choice of giving comments at all, is that

4  right?

5    A    Yes.

6    Q    Comments are not mandatory?  Okay.

7    A    Yes.

8    Q    Would you agree that it was not a negative

9  evaluation?

10    A    It was not sufficient considering my

11  contributions.

12    Q    While Travis McCrory was your supervisor as

13  TPD division director, did he give you two cash awards

14  in recognition of work that you had done?

15    A    He did.  I had worked on a key project, the

16  long-distance learning project, and I believe that's --

17  I received a $1,000 cash award.  I don't remember the

18  date, the timing.

19    Q    When Travis McCrory left TPD, do you recall

20  thanking him for being a good mentor and for all that

21  he had done?

22        JUDGE COLLAZO:  I'm sorry.  When who left?

**Diversified Reporting Services, Inc.**
1101 Sixteenth Street, NW Second Floor
Washington, DC 20036
(202) 467-9200

64

1    believe, on the 18th.  It was open like for -- if it's

2    my -- I think my recollection is it was even less than

3    two weeks, so I'm not real sure, from the time it was

4    posted on the Internet, or the Intranet.

5         And had it not been because someone called me,

6    I never would have known that it was even open, because

7    I wasn't returning until the end of June, the 26th, I

8    believe.

9         Q    You were on medical leave from April 8th to

10   June 24th, 2002, is that right, during that whole time?

11        A    Was it the 24th?  I want to say it was the

12   26th, but I could be off by a day or so.

13        Q    Okay.  And the vacancy announcement for the

14   TPD director position, open on June 4th, 2002?

15        A    I think it was posted on the 8th, actually.

16   That why I said it was a very short time, because it

17   closed on the 18th.  So, it was like ten days.

18        Q    And Maureen Smythe, the specialist assistant

19   to the comptroller, emailed you on June 5th, 2002 to

20   let you know of the vacancy, didn't she?

21        A    Well, I had no access to email.  I was on

22   medical leave.  I came back on the 26th, so I had a ton

65

1    of emails including Maureen's when I returned.  And it

2    was after the fact.

3        Q    You had an OJP laptop with you while you were

4    on medical leave --

5        A    No.

6        Q    -- is that right?

7        A    No.

8        Q    Okay.  Ms. Smythe also told your daughter by

9    phone, asked to give you a message that the vacancy was

10   posted, didn't she?

11       A    A message that I got somewhat later.  My

12   daughter was recovering.  I mean, we had just gotten

13   her home from the hospital not too long before that.

14   She had open-heart surgery, and I was on a walker.  I

15   was -- I had back surgery.  I was -- I had just gone

16   down the hall because I was supposed to exercise and I

17   -- just walking up in the condominium building on her

18   floor, when the call came.  And I think she answered

19   the phone, because she thought it was the pharmacy or

20   something.  And I didn't find out about it -- you know.

21   She was under medication and she slept a lot.  And so,

22   I didn't find out about the message until much later.

66

1    I don't recall exactly when.

2        Q    Okay.  But Ms. Smythe did attempt to contact

3    you by email and by telephone to let you know about the

4    vacancy, is that right?

5        A    Well, you know --

6             JUDGE COLLAZO:  Yes or no?

7             THE WITNESS:  Yes.

8             JUDGE COLLAZO:  Thank you.

9             MS. BURKE:  Thank you.

10            JUDGE COLLAZO:  Let's move along.

11            BY MS. BURKE:

12       Q    Ms. Gonzales, you've testified that you are a

13   Branch Manager in the External Oversight Division?

14       A    Yes.

15       Q    And you became a branch manager in that

16   division, which was previously the Monitoring Division,

17   in October 2003?

18       A    No.

19       Q    Okay.  When did you begin work in the

20   monitoring division, which is now the External

21   Oversight Division?

22       A    I requested the transfer from my branch

68

1    McIntosh?

2        A    Yes.

3        Q    Okay.  So you became her supervisor in October

4    of 2003, is that right?

5        A    Yes.

6        Q    Okay.  Before that you had not supervised her?

7        A    No.

8        Q    If we can just go back to the issue of

9    performance evaluations for a moment.

10           When Travis McCrory compiled a performance

11   evaluation and gave you results achieved in every

12   category, you refused to sign that evaluation, is that

13   right?

14       A    Yes.

15       Q    Okay.  And you don't think that Joanne

16   Suttington fairly assessed your abilities, either, did

17   you?

18           JUDGE COLLAZO:  I'm sorry.  What's the

19   question?

20           MS. BURKE:  The question is whether Ms.

21   Gonzales believed that Joanne Suttington fairly

22   assessed her abilities.

69

1        JUDGE COLLAZO:  When she became the director?

2        MS. BURKE:  Yes.

3        THE WITNESS:  Am I allowed to go back to the

4    previous question?

5        JUDGE COLLAZO:  What do you want to say about

6    the previous question?

7        THE WITNESS:  I did not sign the evaluation

8    for a number of reasons.  One, which was really

9    critical I felt, was that Mr. McCrory was attempting to

10   evaluate me for a period during which he did not

11   supervise me.  The evaluation was for like an 18-, 20-

12   month period, and he became my division director in

13   November of 2000.  And the evaluation was supposed to

14   cover, I believe, March of 2000 or June of 2000 to June

15   of 2001, and he had become a supervisor in November of

16   2000.

17       And not only that, but the evaluation was

18   very, very late.  It was given to me long after June of

19   2001.

20       BY MS. BURKE:

21   Q    Jerry Conty is your current supervisor, is

22   that right?

**Diversified Reporting Services, Inc.**
1101 Sixteenth Street, NW  Second Floor
Washington, DC  20036
(202) 467-9200

70

1          A    Yes.

2          Q    In June 2004, he prepared a performance

3     evaluation for you, is that right?

4          A    Yes.

5               MS. BECKER:  Objection.

6               Outside the scope, and relevance of the non-

7     selection, an issue of 2002.

8               JUDGE COLLAZO:  Sustained.

9               MS. BURKE:  Judge, I --

10              JUDGE COLLAZO:  I know where you're going.

11              You're going with the fact that she is

12    complaining or objecting a reevaluation she got.

13    Right?

14              MS. BURKE:  Yes.

15              JUDGE COLLAZO:  I got it.

16              Let's move.

17              MS. BURKE:  Okay.

18              THE WITNESS:  May I say something to that?

19              JUDGE COLLAZO:  No.

20              THE WITNESS:  Thank you.

21              MS. BURKE:  Nothing further, thank you.

22              JUDGE COLLAZO:  Redirect?

1          MR. COOLEY:  Thank you, Judge.

2                  DIRECT EXAMINATION

3          BY MR. COOLEY:

4     Q     Please state your name for the record?

5     A     Cynthia Schwimer.

6     Q     Where do you work, Ms. Schwimer?

7     A     At the United States Department of Justice,

8  Office of Justice Programs.

9     Q     And in what capacity are you employed by the

10  Office of Justice Programs?

11     A     I'm the Comptroller for the Office of Justice

12  Programs.

13     Q     When did you become the comptroller?

14     A     In January 1997.

15     Q     For how long have you worked for the Office of

16  Justice Programs, Office of the Comptroller?

17     A     For about 20 years.

18     Q     What are the responsibilities of the Office of

19  the Comptroller?

20     A     We're the internal accountants for the office,

21  for the Office of Justice Programs, and we record all

22  the financial transactions for the agency as well as

91

1    Judge, with an exhibit?  This is in Exhibit 6, Exhibit

2    E-6-D.

3             BY MR. COOLEY:

4        Q    Ms. Schwimer, do you recognize that document?

5        A    Yes, I do.

6        Q    What is that?

7        A    That's the announcement for the director of

8    the Training and Policy Division.

9        Q    If I can direct your attention to the top of

10   that document where it talks of area of consideration?

11       A    Yes.

12       Q    Who determined that area of consideration for

13   this announcement?

14       A    I did.

15       Q    What was that area of consideration?

16       A    It's OJP-wide.

17       Q    What does OJP-wide mean?

18       A    That means that all of the eligible candidates

19   within the Office of Justice Programs could apply for

20   this position.

21       Q    Why did you decide that the announcement

22   should be OJP-wide?

92

1      A     Because -- there were a couple of reasons,

2    actually.  I believed we had in-house candidates that

3    would be qualified for this position, as well as I

4    think we had some FTE issues; and if you advertise OJP-

5    wide, you don't need additional FTEs.

6      Q     If I can direct your attention to the opening

7    date, what is the opening date on the announcement?

8      A     June 4th, 2002.

9      Q     Who determined the opening date of this

10    announcement?

11      A     That would be HRD, Human Resources Division,

12    formerly known as the Office of Personnel.

13      Q     Did you have a say in when it was to open?

14      A     No.

15      Q     Who determined that it would be open for two

16    weeks?

17      A     I did.

18      Q     At the time you decided that it would be open

19    for two weeks, did you know that it was going to

20    actually open up on July 4th?

21      A     No, I did not.

22      Q     I'm sorry, June 4th?

93

1     A    June 4th, right.  June 4th.  No, I did not.

2     Q    Why did you decide it should be open for two

3  weeks?

4     A    Generally it's my practice that when I have an

5  OJP-wide announcement, I open it for the shortest

6  period of time, because I have enough candidates, and

7  two weeks is the shortest period of time I can open it.

8     Q    When this announcement opened, was Ms.

9  Gonzales in the office?

10     A    I don't believe she was.

11     Q    Why wasn't she?

12     A    I believe she had some health issues.

13     Q    What did you do about her absence?

14     A    In terms of the vacancy?

15     Q    Yes.

16     A    I directed my special assistant, Maureen

17  Smythe, to get in contact with her so that she would be

18  aware that the vacancy announcement was being posted,

19  to give her an opportunity to apply.

20     Q    Did Ms. Smythe do so?

21     A    Yes, I believe she did.

22     Q    How did Ms. Smythe do so?

94

1    A    I believe she sent her an email.

2         MR. COOLEY:  Judge, may I approach the witness

3    again?

4         JUDGE COLLAZO:  Yes.

5         MR. COOLEY:  Thank you.  This is Exhibit D-5

6    of the ROI.

7         BY MR. COOLEY:

8    Q    Do you recognize that document?

9    A    Yes, I do.

10   Q    What is that?

11   A    It's an email from Maureen Smythe to Ada

12   Gonzales announcing -- or notifying her that the

13   vacancy was being posted.

14   Q    What's the date of this email?

15   A    June 5th, 2002.

16   Q    And who are the recipients?

17   A    Myself, Ada and Travis McCrory.

18   Q    Going back to the vacancy announcement, how

19   did you learn of its posting?

20   A    I believe I was notified by personnel that it

21   was posted.

22   Q    And who was responsible for posting it?

95

1      A    HRD, Human Resources Division.

2      Q    After it was posted, what was your next

3 involvement in the selection process?

4      A    I received a promotion candidate list and I

5 made a selection.

6      Q    What is the promotion candidate list, or

7 candidate promotion list?

8      A    Yes.  The promotion candidate list, or we also

9 call it a cert, is a list that comes to me from HRD,

10 and it identifies all of the eligible, qualified

11 applicants for that position.

12           MR. COOLEY:  May I approach the witness, Your

13 Honor?

14           JUDGE COLLAZO:  Yes.  You don't need to ask

15 me.  Just make sure that we get the documents that

16 you're showing her.

17           MR. COOLEY:  This is Exhibit E-6-F of the ROI.

18           BY MR. COOLEY:

19      Q    Do you recognize that document, Ms. Schwimer?

20      A    Yes, everything but some of the writing next

21 to the names.

22      Q    Which writing are you referring to?

96

1      A      Next to Conty it says Hispanic male, and

2  Gonzales, Hispanic female.   That printing.

3      Q      And what is this document?

4      A      This is the promotion candidate list, or what

5  we call the cert.

6      Q      Is that what you -- when you said you received

7  a cert list, is that the document?

8      A      Yes, absent that writing, yes.

9      Q      When did you receive the candidate -- or

10  promotion candidate list?

11      A      About July 16th.

12      Q      Prior to receiving the cert list on about July

13  16th, did you know who had applied for this position?

14      A      No, I did not.

15      Q      Vacancy announcement had a closing date of

16  June 18th.  Do you know why it took almost a month for

17  the cert list to make it to your office?

18      A      No, I do not know.

19      Q      When did you know that Ms. Gonzales had

20  pursued EEO activity against Mr. McCrory?

21      A      Before this.   I'm not exactly sure of the

22  date.

1      Q    When you saw her name on this list, why didn't

2  you recuse yourself from the selection process?

3      A    I've not done so in the past.  I've certainly

4  hired people off of a promotion candidate list when

5  they have filed claims against me in the past when

6  there have been open claims.

7      Q    Looking back at the cert list, who on that

8  list was already known to you?

9      A    Actually all four of them were known to me.

10     Q    How did you Jerry Conty?

11     A    I've known Jerry for about 17 years.  He's

12  worked in the Office of the Comptroller for about 17

13  years; and Ada for about 10; Maureen about 20; and

14  Joanne for about 10 as well.

15     Q    Now, what was Ms. Gonzales' position at the

16  time of her application?

17     A    She was the manager of the Training and Policy

18  Branch.

19     Q    And what was Ms. Suttington's position at the

20  time she applied for this position?

21     A    She was manager of the Financial Services

22  Branch of the Financial Management Division.

**Diversified Reporting Services, Inc.**
1101 Sixteenth Street, NW  Second Floor
Washington, DC  20036
(202) 467-9200

98

1      Q    In the entire time that you have been

2   comptroller, Ms. Gonzales and Ms. Suttington worked

3   under you?

4      A    Yes, that's correct.

5      Q    When you received this list, promotion

6   candidate list, was it accompanied with anything, or by

7   anything?

8      A    Yes.  It had all of the applications as well.

9      Q    What did you do once you got the list and the

10  applications?

11     A    I did a cursory review of the applications and

12  made a selection.

13     Q    Who did you select?

14     A    Joanne Suttington.

15     Q    Did you discuss this selection with anyone

16  before you made it?

17     A    Not that I recall.

18     Q    Did you interview any of the candidates?

19     A    No, I did not.

20     Q    Why not?

21     A    I don't generally interview candidates that I

22  know, and OJP-wide candidates generally are known to

99

1    me.

2        Q    Why did you select Ms. Suttington over Ms.

3    Gonzales?

4        A    As you know, I received this list of four

5    qualified people from HRD, and it's my job to figure

6    out who is the best candidate for the position.  And in

7    doing that, I considered lots of things.  My personal

8    observations of these candidates during my tenure as

9    comptroller for the past eight years or so; my personal

10   experience with them, as well as the impressions that I

11   had received from their previous supervisors.  And in

12   comparing Joanne and Ada, I believed that Joanne would

13   be more coachable, that she'd be more responsive to the

14   needs of the office, that she would hold herself

15   accountable for what goes on in the office, and I felt

16   that she would be a better problem solver.

17            I also considered their educational

18   experience.  Both have masters degrees.  Joanne is also

19   a certified public accountant.  And I considered the

20   impressions that I had received, the feedback that I

21   had received over the past eight years or so from Larry

22   Hailes, who has been Joanne Suttington's director

100

1   during this period of time, as well as Ada's directors,

2   Stacey Worthington, Travis McCrory and, more recently

3   at that time, Elliot Brown.

4        And given all of that and all of those issues,

5   I felt that -- oh, there was one other issue, too, that

6   was in my consideration, and that was staffing issues.

7   I considered staffing issues that were known to me from

8   the two folks, Joanne and Ada.  No staffing issues had

9   come to my attention under Joanne's -- from Joanne's

10  folks; whereas, Ada's, I had a couple of issues with

11  certain folks that had worked for Ada.

12       So, given all of that, I felt that Joanne was

13  a better candidate and I selected her for the director

14  of the Training and Policy Division.

15       JUDGE COLLAZO:  What do you mean by staffing

16  issues?

17       THE WITNESS:  I had a situation when I

18  appointed Ada as the acting director for the Training

19  and Policy Division in 2000.  I think it was August

20  through November of 2000.  It was a three-month period

21  of time, when one of her employees, Mike Williams, came

22  to me with an issue relating to leave that I eventually

101

1    had to overturn.  And this is an employee that you

2    would have to work with, and this is also an employee

3    that never comes to me at all with any issues, so it

4    was rather amazing that he would come to me about an

5    issue that he had with her.  It was my impression that

6    he was speaking in general terms about other issues

7    that other staff under her supervision also had.  And I

8    just didn't have that kind of input from Joanne's

9    people.

10           JUDGE COLLAZO:  Mr. Cooley?

11           MR. COOLEY:  Thank you, Judge.

12           BY MR. COOLEY:

13    Q    You said that Ms. Suttington is more coachable

14    than Ms. Gonzales.  What do you mean by that?

15    A    When I say coachable, I mean flexible, more --

16    quicker to take more direct guidance in terms of taking

17    their own initiative and not requiring as much hand-

18    holding, if you will.

19    Q    I believe you also said that she was more

20    responsive -- Ms. Suttington was more responsive to

21    needs.  What did you mean by that?

22    A    It was my belief that she -- and based on my

113

1  necessarily just the educational issues.

2      Q    I guess -- I mean, you're interpreting your

3  answer.  But I'm just having to deal with what you

4  said.

5      A    Um-hum.

6      Q    My question is, in what respect were her

7  credentials far more extensive than Ms. Gonzales?

8      A    I believe I discussed that already in terms of

9  -- credentials were far more extensive to me than just

10  their educational backgrounds.

11      Q    Well, what are credentials?

12      A    As I meant it in that particular statement, it

13  was everything, the whole -- coachable, accountable,

14  being responsive, you know, their managerial skills.

15  It was all-encompassing to me.  That was a very general

16  response.

17      Q    So when you said credentials, you meant

18  qualifications?

19      A    Yes.

20      Q    Okay.  And let's talk about this Mike Williams

21  situation for a little bit.  What specifically was it

22  that he was complaining about, do you recall?

114

1     A     I don't recall the exact specifics except that

2  there was a leave issue, that she had ruled a certain

3  way on a leave issue and I had to overturn it, because

4  her rationale was not reasonable to me.

5     Q     Is that all you can recall about that?

6     A     That's all I recall.

7     Q     Was Ms. Gonzales Mr. Williams' direct

8  supervisor?

9     A     Ms. Gonzales was the acting director for the

10  Training and Policy Division at that time.

11     Q     Would that have made her his direct

12  supervisor?

13     A     I believe there was a person between the two,

14  yes.

15     Q     Who would that have been?

16     A     I believe that was Cynthia Gaines.

17     Q     And what was Cynthia Gaines' role in this

18  leave issue?

19     A     I'm not certain.  I don't recall.

20     Q     Well, did she approve the leave?

21     A     I don't recall.  The issue that came to my

22  attention was not about Cynthia, it was about Ada.

121

1          JUDGE COLLAZO:  Okay, while we wait for Mr.

2     Williams.

3          MR. KATOR:  Thank you, Judge.

4          JUDGE COLLAZO:  Thank you.

5          (A brief recess was taken.)

6          JUDGE COLLAZO:  And we have our next witness,

7     Mr. Williams.

8          Mr. Williams, I'm going to swear you in.

9     Whereupon,

10               MICHAEL WILLIAMS,

11    was called as a witness and, having been first duly

12    sworn, was examined and testified as follows:

13          JUDGE COLLAZO:  Mr. Cooley.

14               DIRECT EXAMINATION

15          BY MR. COOLEY:

16     Q    Please state your name?

17     A    Michael Williams.

18     Q    Where do you work, Mr. Williams?

19     A    I work in the comptroller's office --

20     Q    Here at the --

21     A    -- in the Training and Policy Division.

22     Q    Here at the Office of Justice Programs?

1    A    As I remember, I explained to her that -- I

2  explained to her that I had purchased a ticket for my

3  wife to go down on a Monday, and she told me that, you

4  know, she understood and sympathized with that.  But

5  her position was that she needed a trainer and a policy

6  writer in the office.  And I explained to her that even

7  though Charlene was training, she wasn't technically a

8  trainer; so, to go to her and ask her to work in my

9  space, my spot that Monday, to me at that point didn't

10  make a whole lot of sense if they truly needed a policy

11  writer and a trainer working on that particular day,

12  Monday.

13        So, like I said, she explained that -- she

14  apologized, or she sympathized with my situation, but

15  there was nothing that she could do.

16    Q    And what did you do after that discussion with

17  her?

18    A    At that point I went down and spoke to the

19  comptroller's secretary and asked could I meet with her

20  to explain my position, or my dilemma.

21    Q    And did you have that meeting?

22    A    I had that meeting with Ms. Schwimer along

**Diversified Reporting Services, Inc.**
1101 Sixteenth Street, NW  Second Floor
Washington, DC  20036
(202) 467-9200

128

1    with Elliot Brown, and I explained to Ms. Schwimer at

2    that time my dilemma.  And actually I explained to her

3    that I thought that it was a little bit more than that,

4    because I had been experiencing problems with Ms.

5    Gonzales, and I just thought that this was all leading

6    up to it, or it came to a head.

7              So I started at the beginning when Ms.

8    Gonzales had first came to Training and Policy

9    Division, and explained all the run-ins that we had had

10   from that point where she first came aboard, to that

11   date that drove me to come see Ms. Schwimer.

12        Q    Focusing on the leave issue, what was the

13   result of your meeting with Ms. Schwimer related to the

14   leave matter?

15        A    When I explained what I was trying to do with

16   my wife, Ms. Schwimer told me that she can understand

17   since it was only a one-day request that I was asking

18   for.  So she told me that she would speak to Ms.

19   Gonzales and see if something could be arranged.

20             So, I guess about a half an hour later, 45

21   minutes, Ms. Gonzales came to me and told me that it

22   was approved.

1     Q    You mentioned problems with Ms. Gonzales that

2  you also raised with Ms. Schwimer.  What were those?

3     A    Problems that I was having with Ms. Gonzales

4  was that when she first came to Training and Policy

5  Division, at that point the training coordinator had

6  just left, so that's how I moved into the acting, I

7  guess, training coordinator's position.  And like I

8  said, I was also a trainer.

9        So, at that point I was responsible for

10  working with our vendor to set up training, logistical

11  trainings for our regional grantees for not only Office

12  of Justice Programs, but also the COPS office.  So when

13  Ms. Gonzales came aboard, there was a meeting that was

14  scheduled with some management from the COPS office

15  along with the director here, and at that time it was

16  Mr. Stacey Worthington, about training, to try to pull

17  the training together, to try to get it, you know,

18  scheduled.

19        So, Cynthia Bowie, who was the manager over at

20  the COPS office, along with Stacey Worthington, asked

21  would I sit in the meeting to try to assist with

22  getting this training finalized.  So, I came in and sat

**Diversified Reporting Services, Inc.**
1101 Sixteenth Street, NW  Second Floor
Washington, DC  20036
(202) 467-9200

1    down in a meeting, and we talked about what needed to

2    be done.   And after the meeting, Ms. Gonzales

3    approached me and asked me, since she was new and just

4    coming and she was trying to get her feet wet, would I

5    mind cc'ing her on all correspondence that were going

6    out to the office so she could get a feel on the day-

7    to-day operations.   So I told her, not a problem.

8         About a week later I hadn't heard from Ms.

9    Bowie, so I sent her an email to try to find out where

10   she was, because the contractor was like trying to push

11   me to get this finalized so we could set some dates

12   with hotels.   So, I drafted a memo to Ms. Bowie, and I

13   cc'd the normal people -- Stacey Worthington, Ada

14   Gonzales, and I believe I might've cc'd some other

15   people.

16        So, Ms. Gonzales came around to me -- after I

17   sent the email, Ms. Gonzales came around to my cubicle

18   and asked me could she speak with me for a minute.   So,

19   I came around to her cubicle, and she sat down and she

20   said, Mike, I really would've liked to have seen this

21   email before you sent it out.   So I said, well, I was

22   doing what you asked me to do.   You asked me to cc you

1    on all correspondence.  She said, yes, yes, I know, but

2    I would've really like to have seen this before you

3    sent it out.

4            So I said, well, Ada, the only way I could've

5    showed it to you before I sent it out was to draft the

6    email, print it out and bring it around to you.  So I

7    said, is that what you're asking me to do?  So she

8    said, no, that's not what I'm asking you to do.  But I

9    really would've like to have seen this before you sent

10   it out.

11           So, based on that, I was actually confused,

12   because I thought the only way for her to review it

13   before I sent it out was to print it and take it around

14   to her.

15           So I left her cubicle and went to Mr.

16   Worthington and explained to him that I had asked her

17   three times did she want me to print it out first

18   before I sent it out and she told me no.  So, Mr.

19   Worthington told me that he would speak to her, because

20   he didn't see what the problem was.  He said that he

21   had enough confidence in me to handle certain office

22   matters at that level.

1          So, he spoke with Ms. Gonzales, and we had a

2   meeting, saying that in the future with all

3   correspondence that were going out, we needed to cc all

4   the people in the office that had a need to know.

5          Q     And that was the issue that -- the problem

6   that you raised with Ms. Schwimer?

7          A     Well, that was one of the issues that -- well,

8   that was what actually started it.  So, I mentioned

9   that particular one.  Then there were other situations

10  where I was still cc'ing Ms. Gonzales with all of my

11  work that was going on, but apparently that wasn't -- I

12  want to say sufficient.  I'm not sure whether or not

13  that's the proper word to use.  But Ms. Gonzales had

14  sent an email message back to Ms. Gaines telling Ms.

15  Gaines that all the other people in the office had

16  learned to work through the process of dealing -- going

17  directly through herself or Cynthia Gaines, but for

18  some reason I had not caught on to that.

19         What was happening, what -- I think what

20  triggered this particular email was, I believe Travis

21  McCrory was her director.  Travis came to me with a

22  project that he wanted me to work on.  So, as I was

133

1    responding back to Mr. McCrory, I cc'd everyone, okay,

2    Ada being one.  And this generated this email from Ada,

3    and I think by accident she left my name on it, because

4    it was directed to Cynthia Gaines.  And then I believe

5    that after she realized that I received a copy of it,

6    then we had a meeting in reference to that email that I

7    received by accident.

8           Another issue was that it seemed like all of

9    my work had to be -- had to go through Ms. Gonzales for

10   approval before it was sent it.  Which I really didn't

11   have a problem with.  A program person would contact me

12   for training, and I would sit down with them to get the

13   information from them for -- in order to create the

14   slide presentation.  So, my slides -- so when I came

15   back and created my slides, all of my slides had to go

16   through Ms. Gonzales for approval.  Which truly wasn't

17   a problem, but in most cases the lag time from getting

18   this work back from Ms. Gonzales didn't allow me to

19   make any changes or any additional changes if the

20   training was coming up pretty fast.

21          And then when I was doing -- another component

22   of training and policy is the customer service center,

134

1    where grantees send us indirectly financial questions

2    So when I would get financial questions, they would

3    have to go through Ms. Gonzales in order to be approved

4    or edited before I could send them out, and this was

5    also causing a delay.  And in most cases when I open up

6    the financial presentations that I do, I tell them that

7    I feel that I'm committed to give them a response

8    within 48 hours, based on the research that I need to

9    do with their question.  But going through the -- not

10   because it was going through the process, but the

11   amount of time that Ms. Gonzales was holding on to my

12   response to grantees, it was outside of that window.

13           And finally I had to step forward and complain

14   about it before it stopped, because what had happened

15   was a grantee had sent an email and I told him I'd get

16   right back to him.  I drafted up a response, I gave it

17   to Ms. Gonzales, and then -- I believe it was like on a

18   Monday, because the next day, Tuesday, I had to travel

19   for training; and when I came back from travel, a

20   couple days later Cynthia Gaines gave me the email,

21   saying that Ms. Gonzales said that she didn't have a

22   problem with the email, I could send it out.  So I told

1   Ms. Gaines that I didn't want to send it out, because I

2   have noticed a pattern that every time I'm trying to

3   respond to a grantee, it was outside of the 45 days

4   that I was trying to do it.  And when I was getting my

5   emails or my responses back from Ms. Gonzales --

6          Because I had asked her, you know, what was

7   her problem with how I was sending it out.  She said,

8   well, it's not that it's wrong or anything; it's just

9   that I think it's a better way to state what you're

10  saying.  So, there were some minor edits, or maybe even

11  some reconstructions that she would do, but that's the

12  process that was going.

13         So I got concerned, and I asked other

14  employees in the Training and Policy Division, was this

15  also happening to them, and they told me that, no.  One

16  of our trainers, Angela Pearson -- because she created

17  slide presentations also.  So I asked her was Ada

18  scrutinizing her work in the same fashion that she was

19  doing mine, and she told me no.  She said, I never give

20  Ada my slides to review.

21         So I said, well, what about financial

22  question?  So she said, no.  She said, Mike, she said,

1    I cc her on what I'm doing because that's what required

2    of us, but she doesn't my -- any of my work before I

3    send it out.

4            MR. COOLEY:   I have no further questions for

5    the witness, Judge.

6                      CROSS EXAMINATION

7            BY MS. BECKER:

8        Q    Good morning, Mr. Williams.

9        A    Good morning.

10       Q    Just so that I understand, your direct

11   supervisor was Cynthia Gaines this whole time?

12       A    Correct.

13       Q    And Ada Gonzales, Ms. Gonzales was never your

14   direct supervisor?

15       A    Correct.

16       Q    You mentioned -- it sounds like you were

17   having email issues as one of the issues that might've

18   raised.  Did you raise that issue with Ms. Schwimer,

19   the fact that you were having email issues with Ms.

20   Gonzales?

21       A    Yes.   When I sat down -- unfortunately when I

22   sat down and talked to Ms. Schwimer, I started from the

1  date of the first incident when we had the meeting, and

2  -- because I -- to be honest with you, I thought that

3  there was some type of character conflict between

4  myself and Ms. Gonzales.  So, when I started feeling

5  that, I started documenting certain things.  So when I

6  went to sit down with Ms. Schwimer, I grabbed all my

7  notes and took them down there and I started from the

8  first date, all the way to the leave slip, as to things

9  that were going on with myself and Ms. Gonzales.

10      Q    You wanted that one-day leave to go down with

11  your wife?

12      A    Correct.

13      Q    And you came up there with issues to sort of

14  support your case to say I should be granted leave for

15  one day?

16      A    Well, no.  What I -- to be honest with you, I

17  did come down there with a list of issues.

18      Q    Um-hum?

19      A    I didn't want that to support my leave.  I

20  just wanted to -- I didn't want to seem like I was, I

21  guess, say, picking on Ms. Gonzales; but I just wanted

22  to show that there was a conflict between us, that I

138

1    had no clue of what it was.

2         Q    Now, Ms. Gaines, your first-line supervisor,

3    she was in charge of approving your leave, right?

4         A    Correct.

5         Q    And so she denied your leave?

6         A    No, she didn't.  She forwarded it on to Ms.

7    Gonzales as of her instructions, that she needed to see

8    all leave requests.  I did not send my leave request to

9    Ms. Gonzales; I sent it to Cynthia Gaines.

10        Q    And so if your -- what's your understanding of

11   leave approval; that your supervisor approves it or

12   that --

13        A    Well, when I first came to TPD and before Ms.

14   Gonzales got there, I submitted all my leave to Cynthia

15   Gaines and she either approved or disapproved them.

16   For the time that Ms. Gonzales was acting, my leave

17   went through -- went from Ms. Gaines to Ms. Gonzales.

18   Then after Ms. Gonzales left, it went -- it still went

19   to Cynthia Gaines, and that's where it's approved or

20   disapproved at.  It had never went to the director

21   before Ms. Gonzales got there, and now that Ms.

22   Gonzales is gone, it still never goes -- to my

1          REDIRECT EXAMINATION

2          BY MR. COOLEY:

3      Q    In addition to the leave matter, Mr. Williams,

4  you mentioned a few other problems.  Did you bring all

5  those to Ms. Schwimer's attention at that meeting that

6  you were describing?

7      A    Correct.  To the best of my abilities, I --

8  and I may have left some out.  I'm not sure whether or

9  not I did.  But based on any type of conflicts that I

10  was having with Ms. Gonzales, I did bring them up.

11          One of the ones that concerned me that I

12  didn't say anything about, because it just came back to

13  my attention, was that based on this particular project

14  with the COPS office, after I got all the information

15  that I needed from them, I started drafting up the

16  blanket purchase agreement and the statement of work.

17  And I was taking it to Ms. Gonzales for approval, okay.

18  Ms. Gonzales gave me some edits that needed to be made

19  on the form, so I took those and went back in, started

20  making the edits.

21          So the next day that I gave it back to Ms.

22  Gonzales, Ms. Gonzales said that that wasn't what she

1   asked of me.  And I told her, I said, well, Ada, this

2   is what you asked me.  I made the edits based on, you

3   know, your changes.  She said, no, this isn't what I

4   made.

5           So, I felt uncomfortable, so I went to Ms.

6   Gaines and asked Ms. Gaines would she mind sitting in

7   on the meetings with Ms. Gonzales, because I didn't fee

8   comfortable.  I know that what I was asked to do I

9   presented to her.  Now, we could make changes to it,

10  but I know I made the edits that she made.  So, Ms.

11  Gaines agreed to sit in on all of the meetings that I

12  had with Ms. Gonzales from that point on.

13      Q    Thank you.

14           MR. COOLEY:  I have nothing further, Judge.

15           JUDGE COLLAZO:  Mr. Williams, thank you for

16  your testimony.  You are excused, and I ask you that

17  you do not comment with anybody outside this room with

18  the testimony you gave us today.

19           THE WITNESS:  Yes, ma'am.

20           JUDGE COLLAZO:  Thank you so much.

21           JUDGE COLLAZO:  Ms. Worthington?

22           MR. COOLEY:  Judge, she -- this is her AWS

146

1       A F T E R N O O N   S E S S I O N

2                                        (1:40 p.m.)

3    Whereupon,

4                     JOANNE SUTTINGTON,

5    was called as a witness and, having been first duly

6    sworn, was examined and testified as follows:

7              JUDGE COLLAZO:  Mr. Kator.

8              MR. KATOR:  Thank you.

9                     DIRECT EXAMINATION

10             BY MR. KATOR:

11       Q    Ms. Suttington, can you hear me okay?

12       A    You have to talk up a little bit louder,

13    because it's not projecting well.

14       Q    Okay.  Is this a little better?

15       A    Yes.

16       Q    Okay.  No one has ever complained about not

17    being able to hear me.  So, if that happens, just

18    please let me know.  If you can't hear me, I'll be

19    happy to speak up.

20             I just wanted to go over -- do you recall

21    being deposed in my office, Ms. Suttington?

22       A    Yes.

147

1    Q    Okay.  And that was February 12th, 2004, is

2    that correct?

3    A    I don't recall the exact date.

4    Q    Okay.  Let me just ask you, just start asking

5    the questions and we'll go from there.

6         You were appointed to -- in August of 2002 to

7    the position of, what, Director of Training and Policy

8    Division?

9    A    Correct.

10   Q    Okay.  When did you apply for that position?

11   A    June 18, 2002.

12   Q    And were you interviewed for that position?

13   A    Hello?

14   Q    I'm sorry.  My question was, were you

15   interviewed for that position?

16   A    I did have a discussion with Cindy after I

17   applied, maybe like a week or so later.

18   Q    Okay.  So, just for point of clarification,

19   she was aware then that you had in fact applied for the

20   position in June of 2002?

21   A    Personnel apparently sent my resume to her.

22   Q    Well, let me just back up and just ask you

148

1    about your previous answer, because you said you met

2    with her in June of 2002 to talk about the position, is

3    that correct?

4        A    That's correct.  That was after the point of

5    me applying for the position.

6        Q    Okay.  When were you interviewed?

7        A    I'm not sure if it was interview.  It was a

8    discussion about the position.  And all I know, it was

9    like a week or so later.  I was in her office

10   discussing another matter, and then she said, by the

11   way, do you have a few minutes.  And so then she said,

12   I notice you applied for the position, and we just had

13   some discussion about the position itself, and that was

14   it.  It was probably like a 3-minute or so

15   conversation.

16       Q    Okay.  Do you -- I realize that you're not

17   wanting to call it an interview right now, but you --

18       A    Well, it could be an interview.  It depends on

19   who's looking at it, whether it's informal -- matter of

20   an interview is probably subjective.  We talked about

21   the position, that's basically what I'm saying.

22       Q    Okay.  In your mind, at least, it was an

149

1    interview, is that correct?

2         A    Right.   I have had interviews where people

3    called me and just asked me to verify my name.   I

4    perceive that as an interview, because I have applied

5    for a position that I was interested in and they were

6    interested in me.

7         Q    Okay.   So --

8         MR. COOLEY:   Judge, sorry to interrupt.   I'm

9    having a lot of trouble hearing -- Can we get the

10   volume up just a little?

11        JUDGE COLLAZO:   Ms. Suttington, you said you

12   talked about the position, and what else did you say?

13        THE WITNESS:   That was just basically it.   We

14   had talked about -- I was in her office -- I'm trying

15   to speak.   And I was in her office discussing another

16   matter, work related, and I'm not sure of the nature of

17   that at this time.   But then after our discussion, then

18   she asked me if I had a few minutes, and she said she

19   had my application on her desk, and we basically just

20   had a -- probably like a 3-minute conversation about

21   the position.

22        BY MR. KATOR:

150

1      Q    What else do you recall about the interview?

2      A    That's basically it.

3      Q    Did she say anything to you about the

4  importance or need for having a CPA?

5      A    No, she didn't.

6      Q    Do you recall -- I'm sorry, you may have

7  answered this.  Do you recall how long the interview

8  lasted?

9      A    Oh, all I could say, it was only minutes,

10  maybe three.  I am not sure exactly.

11      Q    And I believe -- well, let me ask.  Do you

12  recall how it was set up?

13      A    Well, it was informal.  I was in her office on

14  something else discussing a different matter

15  altogether; and then she said to me, by the way, I have

16  your -- something of that sort -- by the way, I have

17  your application on my desk; I'd like to talk to you

18  about it for a few minutes if you have a few minutes.

19      And that's all it was, like that.  So it

20  wasn't like she pre-arranged or anything like that, and

21  I'm not sure why I was in her office, but I know it was

22  work related and we were talking about something else.