Exhibit 6

Deposition of Cynthia Schwimer on July 17, 2008

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

CIVIL DIVISION

- - - - - - - - - - - - - x
                          :
ADA GONZALES             :
                          :
         Plaintiff,       :
                          :
    v.                    :
                          :  CIVIL ACTION NO. 07-0676(PLF)
MICHAEL B MUKSASEY        :
Attorney General of the   :
United States,            :
                          :
         Defendant.       :
                          :
- - - - - - - - - - - - - x

Washington, D.C.

Thursday, July 17, 2008

Deposition of

CYNTHIA SCHWIMER

a witness of lawful age, taken on behalf of the Defendant in the above-entitled action, before Paula J. Iomann, Notary Public in and for the District of Columbia, in the law office of Kator, Parks & Weiser, PLLC, 1200 18th Street, N.W., Suite 1000, Washington, D.C. 20036-2506, commencing at 10:40 a.m.
APPEARANCES:

DIVERSIFIED REPORTING SERVICES, INC.

(202) 467-9200

1   Q   2002. Okay. Did you have a chance to prepare
2   at all for today's deposition?
3   A   Yes, I did.
4   Q   What did you do to prepare?
5   A   I reviewed the position description for the
6   position. I reviewed the applications, the certification
7   list, the EEO complaint, the investigator's report, the
8   hearing. I'm sure there were other documents, but those come
9   to mind.
10  Q   So you had a pretty good opportunity to refresh
11  your memory about most of this?
12  A   Yes, sir.
13  Q   Okay. So what was your involvement then in the
14  selection for the position, director of training and policy?
15  A   What do you mean what was my involvement?
16  Q   What was your role?
17  A   I approved that selection.
18  Q   You made the selection?
19  A   Correct.
20  Q   And were you involved beyond simply making the
21  selection? Did you do anything else?
22  A   In terms of what?
23  Q   Well, you know, you start with I guess

1  Q   Did you rank these people?

2  A   I did not.

3  Q   Did you informally rank them in your own mind?

4  A   Not really.

5  Q   Was it obvious to you who your selection would
6  be?

7  A   No. What do you mean by obvious?

8  Q   Well, was it a decision that you had to mull
9  over for some time, or was it easy for you to come to?

10 A   No. It was fairly easy for me to come to given
11 my experience with each of these individuals.

12 Q   I mean did you take a long time reviewing the --
13 well, what did you do in terms of when you got the cert list?

14 A   Okay. I reviewed the applications that came
15 with the cert list. I considered the information that I had
16 and the experience that I had with each of these individuals.
17 I had known Maureen for, gosh, I guess it was 20 years, and
18 Jerry for about 15 years, and Ada and Joanne for about ten
19 years each. So I already had some experience with each of
20 these individuals. So I considered my experience with these
21 individuals in making my decision.

22 Q   Okay. Did you review the paper?

23 A   Very briefly.

1    Q    Yes. And but you chose instead of appointing
2    Ms. Gonzales, you chose to lateral McCrory, correct?
3    A    Correct.
4    Q    Okay. So going back to the selection in 2002,
5    what happened in McCrory, first of all, that made the
6    position vacant?
7    A    Oh. He accepted a position in another federal
8    agency.
9    Q    Okay. So he left?
10   A    Uh-huh.
11   Q    Why was it that you didn't think that Ada was
12   the best candidate for the job in 2002?
13   A    Okay. Ada was qualified as all of the four
14   people on the cert list were. On paper everybody was
15   qualified. I believed that Joanne would make a better
16   director than Ada for several reasons I think I've
17   mentioned them before, but in terms of being responsive, I
18   needed certain qualities in a division director that I
19   believed Joanne was better than Ada in the regards of being
20   responsive, being accountable for the work that's done in her
21   office. Her supervisory skills, I believed were better than
22   Ada's. And I believed she was, you know, more flexible, more
23   of a team player than Ada would be.

1   Q   Is Joanne Suttington still there?

2   A   I believe she is.

3   Q   She was there when you left in any event?

4   A   Yes, she was.

5   Q   Same position?

6   A   Yes, I think so.

7   Q   But were there any specific negatives that you
8   thought of at the time concerning Ada?

9   A   I don't recall. I just believed that Joanne
10  would be better in that position than Ada.

11  Q   Okay. And you said that the difference between,
12  or at least one of the differences between these two, the
13  2002 and the 2000 vacancies, was that there were no
14  interviews in 2002?

15  A   That's correct.

16  Q   So you did not interview Suttington for the
17  position?

18  A   No.

19  Q   Was it important to you that Ms. Suttington had
20  a CPA?

21  A   What do you mean by important?

22  Q   Well, you made the selection of Suttington. She
23  was a CPA, I guess?

1   A    She was a CPA.  Uh-huh.

2   Q    Was that an important --

3   A    The more important qualities for me were being

4 responsive, being accountable, her supervisory skills, how

5 she would fit in in the management team, being a, you know, a

6 good team member.  Those were important factors for me.

7   Q    All right.  So whether she was a CPA or an MBA

8 or whatever it was, was not as important to you?

9   A    It was as important, but there were other

10 factors that were also important.

11   Q    Do you know if having a CPA or being a CPA was

12 listed as a requirement or a desirable factor for the job?

13   A    It was not.

14   Q    It was neither?

15   A    I don't believe that it was listed as a

16 qualification.

17   Q    What about MBA?

18   A    That was not listed as a qualification either.

19   Q    What about staffing issues?  I know that you had

20 mentioned that at one point.

21   A    Uh-huh.

22   Q    What was that about?

23   A    What do you mean what was that about?

1   Q   Well, you had said that one of the reasons that
2   you didn't think Ada was well suited for the job was because
3   of some staffing issues that had arisen.
4   A   Correct. She had an issue with Michael
5   Williams, who was -- at least this one issue with Michael
6   Williams that I recall having to overturn a leave request
7   that she had denied.
8   Q   He wanted to go to Florida with his girlfriend
9   or something like that?
10  A   I'm not sure of the specifics.
11  Q   And when was this staffing issue?
12  A   I don't recall the date.
13  Q   But I mean was Ada acting as supervisor in some
14  capacity, as his supervisor?
15  A   Yes.
16  Q   And what role was she acting in?
17  A   I believe she was acting director at the time.
18  Q   Do you know, was Suttington ever acting
19  director?
20  A   I don't recall.
21  Q   And so while she was acting director, do you
22  recall how long a period she was acting director?
23  A   I do not.

Page 26

1  Q     Do you know when she was acting director, was
2  she rated on her performance?
3  A     I'm not sure.
4  Q     All right. Do you recall ever mentioning the
5  staffing issue in any performance appraisal that Ada would
6  have gotten?
7  A     'I don't recall.
8  Q     And do you recall if Ada received any awards
9  during the time she was in this acting position?
10 A     I don't recall if she received an award during
11 her acting position. But I do specifically recall approving
12 an award for her after she had filed a complaint and after we
13 had posted the announcement and before I actually selected
14 the person for the position.
15 Q     And did the award cover the period of time when
16 she was acting director?
17 A     I don't recall the period of time. I recall
18 that it was more of a special act award for translating the
19 financial guide. I believe that was the award.
20 Q     Right. She had to translate into Spanish or
21 something like that?
22 A     Yes. She did a very good job.
23 Q     I imagine that would be very difficult for a

1  training and policy, correct?

2     A     Correct.

3     Q     But Suttington was not?

4     A     I believe she was a branch manager in the
5  financial management division. So she might have actually
6  been acting director when the director was out. I'm not
7  sure.

8     Q     Acting director of the financial management?

9     A     Of the financial management division, correct.
10  Uh-huh.

11     Q     Is it fair to say that you were not pleased with
12  Ada's performance?

13     A     What do you mean by not pleased?

14     Q     Well, I think that's something that I picked up
15  from one of the transcripts.

16     A     Hum.

17     Q     So if you're not comfortable with that
18  characterization, that's okay. You can just say so.

19     A     Well, I wouldn't say I'm not pleased with her.
20  She was just as good a candidate as all the rest.. Joanne, I
21  just believed was better.

22     Q     Okay. What does -- you said that -- earlier
23  today you said that you thought Joanne was more coachable.

1   What does that mean?

2       A    Did I say that today?

3       Q    I think you did. I think I wrote that down. Of
4   course, I can't read my writing, so.

5       A    I know in the past I have said that Joanne is
6   more coachable. And what that means to me -- well, first I
7   guess you need to understand that I come from a sports-
8   oriented background. My son was just drafted by the
9   Philadelphia Phillies.

10      Q    Oh. Congratulations. That's baseball, right?

11      A    Yes, it is baseball.

12      Q    What was your sport?

13      A    I played a couple of different sports, but
14  nothing to the degree that my son has.

15      Q    Not major-league baseball?

16      A    I did not play major-league baseball. My
17  husband is a coach, or was a coach for basketball, both girls
18  and boys basketball, and I assisted coaching him as well.
19  And for someone to be coachable is a really good thing for us
20  in that, you know, that the person is a team player. They've
21  got fire in the belly. They're easily, you know, they take
22  criticism well in terms of being coachable.

23           So, you know, coachable to me meant that this

1  person takes constructive criticism. She doesn't get, you
2  know, really defensive, and that she's willing to learn and,
3  you know, be a team player. That's what coachable meant to
4  me.
5     Q    So is that different than team player?
6     A    It's all part and parcel of the same.
7     Q    And I don't believe you said today, but maybe
8  you did, accountable. Yeah, you did say accountable. What
9  does accountable mean?
10    A    Uh-huh. Being accountable for what goes on in
11 your office. I believe Joanne holds her accountable and she
12 actually proved to do that when she became director. Ada did
13 not do that. When she was acting, she would blame her staff
14 for things that she was actually responsible for. So I
15 needed to have someone who was more accountable for what goes
16 on in the office. That's a good quality.
17    Q    Okay. And let's see. Flexible was another term
18 you used.
19    A    Yeah, that's all part of being coachable.
20    Q    Okay. You were aware of one complaint about
21 Michael Williams and some vague things from Travis and
22 Elliott Brown about Ada. Anything that you're aware of
23 concerning Suttington? Complaints?

1   A   No. No complaints had ever come across my desk
2   or my ears from what I recall.

3   Q   You know, I believe it was Colin Powell who said
4   it. If you're not pissing somebody off, you're not doing
5   your job. That wasn't your experience?

6   A   No.

7   Q   Okay. So are there any other reasons that went
8   into your calculus as to why you ultimately made this
9   decision to select Suttington over Ada?

10   A   No, but, Mr. Kator, I think I really need to
11   make this kind of clear. Now I was in federal service for
12   more than 31 years, and for many of those years, I supervised
13   people, either directly or indirectly. I respect their right
14   to file a complaint. I do.

15   Q   Have you ever filed a complaint?

16   A   I have not. But I respect my employees' rights
17   to file a complaint if they believe that someone has violated
18   their rights. I would not then go behind them and retaliate
19   against them, because they exercised their right. That's not
20   who I am. That's not who I am. That's not who I am
21   personally or professionally. And I did not retaliate
22   against Ada.

23   Q   Okay.

1    necessarily positive?

2        A    Correct.

3        Q    Okay. So it was the case then that negative
4    things did find a way to get documented?

5        A    Right, if they were severe enough. Sure.

6        Q    Okay. But so far as you know, there was never
7    anything severe enough in Ada's case documented?

8        A    I don't recall anything being documented that
9    was severe enough to document.

10       Q    And in terms of the vague comments that Mike --
11   what was his name -- Williams?

12       A    Yes.

13       Q    He said he had the leave issue and then he also
14   said and there's some other things, right? Didn't you say
15   that?

16       A    Something to that effect.

17       Q    Do you recall what these other things were?

18       A    No, I do not.

19       Q    But again you believed him?

20       A    Yes.

21       Q    So even though you didn't know what it was that
22   he was complaining about, you nonetheless believed that it
23   was true?

| | | |
|---|---|---|
| 1 | A | I believed what he was telling me. |
| 2 | Q | And did you investigate it at all? |
| 3 | A | I think you just asked me that question. |
| 4 | Q | Did I? |
| 5 | A | Yes. No, I did not investigate that. |
| 6 | Q | Why not? |
| 7 | A | Because it wasn't severe enough to investigate. |
| 8 | Q | But it was serious enough to keep her from |
| 9 | | getting a job, or at least to play a part in that? |
| 10 | A | Well, Joanne was just better qualified. She was |
| 11 | | -- she, as I said before, had the qualities of the director |
| 12 | | of position -- of that division -- in terms of what I said |
| 13 | | before. She'd hold herself accountable. She was more |
| 14 | | coachable. She was, you know, more responsive and her |
| 15 | | supervisory skills appeared to be better. |
| 16 | | I had no complaints against Joanne, not even |
| 17 | | minor complaints about Joanne. I had minor complaints about |
| 18 | | Ada. Joanne was over the top. |
| 19 | Q | So it was an open-and-shut case in your view in |
| 20 | | terms of her qualifications? |
| 21 | A | After looking at the list and reviewing the, |
| 22 | | albeit a brief review of the paper, and in my view that the |
| 23 | | paper was equal, these other qualities of these individuals |

---

Page 47

1   A   I believed what he was telling me.

2   Q   **And did you investigate it at all?**

3   A   I think you just asked me that question.

4   Q   **Did I?**

5   A   Yes. No, I did not investigate that.

6   Q   **Why not?**

7   A   Because it wasn't severe enough to investigate.

8   Q   **But it was serious enough to keep her from**

9   **getting a job, or at least to play a part in that?**

10   A   Well, Joanne was just better qualified. She was

11   -- she, as I said before, had the qualities of the director

12   of position -- of that division -- in terms of what I said

13   before. She'd hold herself accountable. She was more

14   coachable. She was, you know, more responsive and her

15   supervisory skills appeared to be better.

16        I had no complaints against Joanne, not even

17   minor complaints about Joanne. I had minor complaints about

18   Ada. Joanne was over the top.

19   Q   **So it was an open-and-shut case in your view in**

20   **terms of her qualifications?**

21   A   After looking at the list and reviewing the,

22   albeit a brief review of the paper, and in my view that the

23   paper was equal, these other qualities of these individuals

1  helped me to form my decision.

2      MR. KATOR: All right. Okay. You know what?
3  Let's get off the record for a second.

4      (A brief recess was taken.)

5      MR. KATOR: I have nothing further at this time.

6      MS. JOHNSON: Okay. And what I want to do is to
7  take a few minutes to confer, and then I just want to ask a
8  couple of follow-up questions. Okay?

9      MR. KATOR: Sure. Off the record.

10     (A brief recess was taken.)

11     EXAMINATION BY COUNSEL FOR THE DEFENDANT

12     BY MS. JOHNSON:

13  Q   Ms. Schwimer, did you ever receive any comments
14  from the COPS office regarding Ms. Gonzales' performance?

15  A   Oh, yes, I did at one point in time when she was
16  in the COPS office. They were not very pleased with her
17  performance there. I don't recall the specifics.

18  Q   Did you ever have the occasion to request that
19  Ms. Gonzales be provided an opportunity for training?

20  A   Yes. When she was reassigned to the
21  comptrollers officer after coming from COPS, I thought it
22  would be a really good idea for her to take advantage of an
23  executive development program and I afforded her that

1  opportunity to do so.

2  Q    And why did you do that?

3  A    So that she could learn more about being a
4  supervisor and perhaps get into an executive position.

5  Q    Was the ability to speak Spanish a requirement
6  for the training and policy director position?

7  A    No, it was not.

8  Q    Just so that the record is clear, were you
9  suggesting that the only reason that Ms. Gonzales did not
10 receive the position was because of the incident with Mr.
11 Williams?

12 A    No. No, not at all. That was just one little
13 part of the decision that contributed to the decision. As I
14 had mentioned before, the qualities of the division director,
15 you know, I'm looking for someone that can be responsive,
16 somebody that, you know, can hold themselves accountable and
17 has good supervisory skills and can be a team player and as I
18 had mentioned before being coachable.

19 Q    Now I believe that Mr. Kator used the term vague
20 complaints from the three supervisors that you identified.
21 Were they vague or was your term nonspecific?  Which was your
22 characterization of those complaints?

23 A    It was really nonspecific.

Page 50

1  Q   All right. You know, I believe Mr. Kator
2  earlier in this testimony, indicated that Mrs. Gonzales has
3  filed an EEO complaint where she indicated that you had
4  discriminated against her.
5       In the EEO complaint that she filed, did she
6  mention you at all?
7  A   I don't believe so.
8  Q   Now I believe you testified that Mrs. Gonzales
9  was notified of the vacancy. Do you recall how she was
10 notified of the vacancy for the position?
11 A   Yes. As soon as we decided to post the vacancy,
12 we realized that Ada, Ms. Gonzales, was out on leave. So I
13 made certain that my special assistant, Maureen Smythe, get
14 in touch with her as soon as possible, and I understand that
15 she sent her an email and also talked with her daughter to
16 let her know that the vacancy had been posted, and I believe
17 that was done in short order after the vacancy was posted.
18 Q   Which daughter did Ms. Smythe speak with?
19 A   I believe her name was Jennifer.
20 Q   Is that Ms. Gonzales' daughter?
21 A   I believe that's correct.
22     MS. JOHNSON: That's it, Mr. Kator for us.
23     MR. KATOR: Okay. Thank you.