Exhibit 12

Deposition of Michael Williams

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

CIVIL DIVISION

- - - - - - - - - - - - - x
                          :
ADA GONZALES             :
                          :
          .    Plaintiff,  :
                          :
          v.              :
                          :   CIVIL ACTION NO. 07-0676(PLF)
MICHAEL B. MUKSASEY       :
Attorney General of the   :
United States,            :
                          :
          Defendant.      :
                          :
- - - - - - - - - - - - - x


                    Washington, D.C.

                    Monday, July 21, 2008


Deposition of

                MICHAEL WILLIAMS

a witness of lawful age, taken on behalf of the Defendant in

the above-entitled action, before Paula J. Homann, Notary

Public in and for the District of Columbia, in the law office

of Kator, Parks & Weiser, PLLC, 1200 18th Street, N.W., Suite

1000, Washington, D.C. 20036-2506, commencing at 10:16 a.m.


            DIVERSIFIED REPORTING SERVICES, INC.

                    (202) 467-9200

Page 7

1     Q    Okay.  So I think that you said that in the --

2  well, let me just ask you.  What was the issue with the leave

3  request?  What was that about?

4     A    Okay.  The issue with the leave request was that

5  there was a trip to Orlando, Florida.  One of my

6  responsibilities with the office of the comptroller at that

7  time was to facilitate at these regional trainings.  One of

8  the practices or one of the habits that I had was I would

9  share the calendar year sites with my wife to see if there

10  was a trip that she may be interested in, you know, attending

11  with me.

12        The Orlando, Florida, since she had never been

13  there, said was one that she was interested in going.  So I

14  want to say a week, not less than a week, I submitted a leave

15  request after I had secured the plane tickets for my wife

16  because I had to do those in conjunction with Omega or the

17  Federal carrier.  So once I found out what my actual flight

18  and time was, I made my wife's reservation.

19        So I submitted my leave request to Cynthia

20  Gaines, my first-line supervisor, and I believe it was

21  Thursday before Ms. Gaines came to me and said that my leave

22  had been denied by Ms. Gonzales and if I needed to, you know,

1    speak to her in reference to that, I could.

2            So I went into speak with Ms. Gonzales in

3    reference to it being denied, and I explained my position or

4    my reason for the request because I wanted to take my wife to

5    this particular trip, and we wanted to leave a day earlier.

6    Normally I would have been out of the office Tuesday through

7    Friday anyway.  So all I was trying to do was go down a day

8    early and spend some time with my wife on that particular

9    Monday.

10           Ms. Gonzales explained her position in reference

11   to denying it, saying that if I was able to get someone else

12   in the office to work in my place, then she had no problem

13   with approving the particular leave.  There was only one

14   other trainer in the office of the comptroller, Angela

15   Pearson.

16           But at that time there was someone who was --

17   who had shown an interest in training so we were working,

18   myself and Angela Pearson, was working with this particular

19   individual.  And I believe this person had maybe presented

20   once, maybe twice, but this person, Charlene Cunningham's day

21   off was this particular Monday.

22           So I went in and asked Ms. Cunningham would she

Page 9

1    mind switching her day off based on the dilemma that I had.

2    And she told me based on what she had to do that particular

3    day on her off-day appointments that she had made, she

4    couldn't.

5            So in turn I also asked Ms. Peerman, Angela

6    Peerman.  She was the other trainer.  I asked her could she

7    come in and actually work that particular day.  Ms. Peerman

8    was scheduled to do a ad hoc or another training for a

9    program office, so she wasn't able to come in neither.

10           So I went back to Ms. Gonzales and explained to

11   her what each person had said.  And then she simplifies what

12   my dilemma and said that at this point because she needed

13   someone to cover training, another staff to cover policy,

14   that she had to deny the training.  So I had told her --

15       Q      Deny the leave?

16       A      Deny the -- I'm sorry -- deny the leave.  So I

17   told her, I said, well, if you were going to allow Charlene

18   Cunningham to work in my place and she wasn't a trainer, I

19   was kind of confused as to why you're saying that you need a

20   trainer and a policy person if it would have been okay for

21   Charlene Cunningham to work in my particular place or to fill

22   in for me.

Page 10

1          Again she explained that she sympathized with my

2   position, but based on coverage in the office, she had to

3   deny the request.

4       Q    Okay.  So let me just go back and ask you a

5   couple of things to clarify.  First of all, what's your

6   wife's name?

7       A    Gail Williams.

8       Q    And when did you get married?

9            MS. JOHNSON:  How is that relevant?

10           THE WITNESS:  Well, no, don't.  It's okay

11  because my wife would kill me if she know that I'm sitting up

12  trying to tell him with my head anyway    2003.

13           BY MR. KATOR:

14      Q    2003?

15      A    Uh-huh.

16      Q    So she wasn't your wife at the time?

17      A    Correct.

18      Q    Okay.  So just fiancé, girlfriend?

19      A    Fiancé.

20      Q    Okay.  So let me just make sure I understand

21  this.  You wanted to -- you had a trip to Orlando for

22  business, correct?

Page 11

1      A     Correct.

2      Q     And you made plane reservations to go to

3   Orlando.

4      A     Correct.

5      Q     And also made plane reservations for your fiancé

6   to go.

7      A     Correct.

8      Q     And after you made these reservations, you then

9   ask for leave?

10     A     Yes, after I had secured it, uh-huh, for that

11  one day.

12     Q     Okay.  And then you went to Ms. Gaines and asked

13  her to approve the leave.

14     A     Yes, I submitted it to Ms. Gaines like I

15  normally would.

16     Q     And she did not grant it.  She just told you

17  something different, correct?

18     A     No, she didn't grant it.  She told me that Ms.

19  Gonzales had disapproved it -- had denied it.

20     Q     And to your knowledge, was Ms. Gonzales always

21  involved in granting or approving your leave?

22     A     To my knowledge, no.

1      Q      Okay.  So she, Ms. Gonzales, made a decision

2   about the workload and staffing of the office, and you were

3   unhappy with that decision?

4      A      I guess if I was unhappy, I mean she made a

5   decision about the workload in the office, yes.

6      Q      The staffing.

7      A      Yes, the staffing.

8      Q      Someone needed to be there?

9      A      Uh-huh.

10     Q      And she said it doesn't need to be you, but I

11  need somebody?

12     A      No.  She told me she needed a trainer and a

13  policy person.

14     Q      Okay.

15     A      Uh-huh.

16     Q      A trainer and a policy person.  And so you went

17  to the other trainer and the other trainer said, no, I've got

18  stuff already planned that day?

19     A      She had a ad hoc, another program.  She had

20  training also.  We called it an ad hoc if it's not ours.  If

21  it's for a program office, we normally call it an ad hoc.

22  She was already scheduled to go out and do another training.

Page 13

1          Q      Okay.  And then who was it who gave you the name

2   of Angela Pearson?  Who said maybe you should ask her?

3          A      No, I went on my own to Angela Pearson, because

4   that was the only other person that was off, or actually that

5   could have been a trainer, that would have been in the

6   office.

7          Q      And Angela Pearson --

8          A      See, we only have --

9          Q      Angela Pearson couldn't do it?

10         A      And she couldn't do it because she was scheduled

11  to do another training.

12         Q      So who was the person that you said, well, I

13  don't understand because if she could co it and she wasn't

14  even a trainer, why did Ada need a trainer and a staffer?

15         A      Charlene Cunningham was --

16         Q      Charlene Cunningham.

17         A      Charlene Cunningham was on what I want to say

18  the policy side because the agency did financial training, so

19  they need trainers for that.  And then we also wrote policies

20  for the agency.  So Charlene Cunningham was one of the policy

21  writers.

22                Because we all were -- we normally had this

Page 14

1  problem with only having two facilitators, myself and Angela

2  Pearson, we did a reach out to other people in our agency, in

3  our team, to see whether or not anyone else wanted to become

4  a trainer.  So Charlene Cunningham was one that said that she

5  would give it a try.

6      Q    So how did her name come up?

7      A    Ms. Gonzales referred me to go to her because

8  that was her off day.

9      Q    So she said -- well, okay, you came to her and

10 said, no, Angela Pearson can't do it.  She said why don't you

11 go ask Charlene.  Maybe she can do it.

12     A    No.  She sent me to Charlene Cunningham first.

13 I was unaware that Ms. Pearson had a ad hoc training.  So to

14 try to cover another base after I finished speaking with Ms.

15 Cunningham, I went to Ms. Pearson and asked was she available

16 to also do it.

17     Q    Uh-huh.

18     A    And that's when she had informed that she was

19 also -- she was going to be out of the office doing training.

20     Q    Did Ms. Gonzales know that Pearson was going to

21 be out of the office doing training?

22     A    I can't answer that, but maybe that's her reason

Page 15

1    for not asking me to see, you know, Ms. Pearson.

2         Q    All right.  So she tried to accommodate your

3    request, correct?

4         A    Correct.  I'm sorry.

5         Q    And it just didn't work out.

6         A    Correct.

7         Q    So then you went and you talked to the

8    comptroller?

9         A    Actually I went down to speak to the admin

10   officer because the chain of command sent me to a deputy

11   comptroller but the deputy comptroller was out.  So she told

12   me that I could speak to Ms. Schwimer.

13        Q    Who told you that?

14        A    The admin officer, Linda Jacobs.

15        Q    So after you left with Ms. Gonzales, you then

16   went to -- pardon me.

17             (Interruption to the proceedings.)

18        Q    What was your next step after Ms. Gonzales said

19   I'm sorry, there's nothing I can do for you?

20        A    Okay.  After that, I again went down to the

21   admin officer in order to speak to the deputy controller, Jim

22   McKay.  And Jim McKay was not in the office that particular

Page 16

1   day, so she told me that I could speak with Ms. Schwimer if

2   she was available, and she would let me know.

3          So approximately a half an hour later, she

4   called me and said that Ms. Schwimer could see me.  So I

5   grabbed some documentation and went down to speak with Ms.

6   Schwimer.  When I got down to Ms. Schwimer's office, Elliott

7   Brown, which was her executive assistant, was also in her

8   office.

9          And I stood outside, waiting to see whether or

10  not Mr. Elliott would come out -- Mr. Brown would come out of

11  the office, but he didn't.  She motioned me to come in

12  anyway.  And then at that point she told me that she had

13  asked Mr. Brown to sit in on this particular meeting.

14     Q     So tell me what happened in that meeting?

15     A     In that meeting I explained to Ms. Schwimer that

16  I had put in a request to take my fiancé to Orlando, Florida,

17  for our regional training.  And I had put in a request to

18  Cynthia Gaines for one day, this particular Monday, and I

19  told her that today, which was Thursday, that particular day

20  was Thursday.

21          Ms. Gaines came back to me and said that Ms.

22  Gonzales had denied my request for leave, and I could speak

Page 17

1    to her.  So I went in to speak to Ms. Gonzales and I

2    explained to Schwimer the steps that I went through in

3    reference to the option that she had gave me to ask Ms.

4    Cunningham and the additional request that I had asked of Ms.

5    Pearson.

6            And when I went back to Ms. Gonzales, she had,

7    based on her statement of office coverage, she sympathized

8    with my position, but she was denying my request.

9    Q       And so what did Ms. Schwimer do?

10   A       Ms. Schwimer told me, she said "Well, what are

11   you requesting?"

12           I said, "I'm just requesting one day because

13   I'll be out of the office doing this session for the week

14   anyway.  So I'll be gone Tuesday through Friday anyway.  So I

15   was just asking for one day to go down and spend some time

16   with my fiancé before the training actually started."

17           She told me that she didn't feel that that

18   request was unreasonable, and she would have a conversation

19   with Ms. Gonzales.  But I also explained to her that I

20   thought that this denial was -- this leave denial was a

21   little bit more than just this denial of leave.

22           And she asked me what did I mean.  And I started

Page 18

1    explaining to her that since Ms. Gonzales had been assigned

2    to the training and policy division, that I have experienced

3    several run-ins that appeared to be conflict of character or

4    at attack on me as being a male.  I wasn't sure what.  But no

5    one else in the division was experiencing the same problems

6    that I was with Ms. Gonzales.

7          Q     So you said that you were having problems with

8    her that you thought were either a character issue or because

9    you were male?

10         A     Uh-huh.  I was the only male assigned to

11   training and policy division.

12         Q     And what did you explain to her?

13         A     I explained to her that -- I started with the

14   first incident -- the first incident was that our prior

15   training COTAR left the agency and went to another agency and

16   I was the backup COTR, contracting training -- I'm sorry --

17   technical assistant -- contracting officer's technical

18   assistant -- representative -- I'm sorry.  So I moved into

19   the primary COTR.

20               One of my functions or the functions that was

21   left upon me was to finalize the regional training for the

22   next calendar year.  We did this in conjunction with a COPS

1    office.  What we normally did is we put on a presentation

2    that was considered the office of justice programs and then

3    another one that was COPS office specific.  So we actually

4    did two a month.

5              So one of my -- the responsibility that I was

6    tasked with was to get all the information that I needed from

7    the COPS office in reference to what particular sites or

8    cities that they wanted to have their presentation in.

9              I needed their new slide presentation for the

10   new calendar year, and I needed other type of cost

11   information from them in order to do what is known as a

12   blanket purchase agreement of BPA in order to come up with

13   costs that we were going to do a reimbursement for from the

14   COPS office because I had to do one statement of work and one

15   BPA listing the cost for the office of justice programs along

16   with the COPS office.

17             So there was a meeting called at the office of

18   justice programs with the COPS people in order to get this

19   information.  So my director, who was Stacey Worthington and

20   the manager from the COPS office, Cynthia Bowie, requested

21   that I sit in on that meeting since I was technically the

22   lead COTR at that time.

Page 20

1          So I sat in at the meeting and we talked about

2     what was needed in order to move forward with finalizing this

3     particular contract.  Ms. Gaines -- I'm sorry -- Ms. Bowie

4     explained to me that she would get the information to me as

5     soon as possible so that we could move forward and I could

6     finalize everything.

7          Approximately a week later, since I hadn't heard

8     from Ms. Bowie, I sent her an email requesting this

9     particular information.  Five minutes, maybe ten minutes,

10    after I sent the email, Ms. Gonzales came to my cubicle and

11    asked could she speak with me.  So I came around to her

12    office and sat down and she said, "Mike," she said, "I really

13    would have liked to have seen this email before it actually

14    went out."

15          So I said, "Well, Ms. Gonzales, you asked me to

16    cc you on all correspondence.  And let me explain to you how

17    that came.'

18          After we left the office and I explained to the

19    COPS office everything that I needed, Ms. Gonzales came

20    around to my cubicle, and she said, "Mike, I've been asking a

21    lot of people questions about what goes on in here and

22    everybody is referring me back to you."

Page 21

1           So she said, "You know, as an order to get my

2      feet wet or find out what's going on, would you mind cc'ing

3      me on all correspondence that go out of the office in

4      reference to the day-to-day operations of the training and

5      policy division."

6           So I told her not a problem.  So I send the

7      email, like I said, a week later.  She came and asked me

8      could she speak with me.  So I went around to her office.

9      And she told me, she said, "I would have really liked to have

10     seen this email before you have sent it."

11          So I explained to Ms. Gonzales that all I was

12     doing was following her original instructions that I cc her

13     on all correspondence with people that I was dealing with

14     inside and outside of the office of justice program.

15          She said, "Yes, I know, but I really would have

16     like to have seen this."

17          I said, "Well, Ms. Gonzales  the only way that I

18     think that you could have seen it is if I had drafted the

19     email, printed it out, and bought (sic) it around for you to

20     see."  So I said, "Is that what you're asking of me?"

21          She said, "Well, no, but I really would have

22     liked to have seen it before you sent it out."

Page 22

1          So at that point, again I was confused because

2    to me that's the only way I could have actually complied with

3    I believe what she was trying to ask me.

4          So I went to the director and the director at

5    that time was Stacey Worthington and explained to him that I

6    had asked Ms. Gonzales a couple of times, three times, I

7    believe, that I was having a problem understanding what she

8    was asking me in reference to this email that I had sent out

9    to Cynthia Bowie in reference to the information that I

10   needed to complete the blanket purchase agreement and the

11   statement of work.

12         So Mr. Worthington told me that he would have a

13   talk with Ms. Gonzales because based on my grade level at the

14   time, he had enough confidence in me to get certain types of

15   day-to-day work done.

16         The next day, Mr. Worthington called a meeting

17   of all the training and policy division and in that meeting,

18   some basic guidelines were discussed, and one of the things

19   that was discussed was that we needed to cc all management

20   within training and policy on information that we were

21   sending out on a needs-to-know basis.  If they felt that they

22   needed to know then we needed to cc these people with this

Page 23

1    particular type of information.

2              So based on that, from then on, and Ms. Gonzales

3    has already requested that I do that, so it was nothing new,

4    I continued to cc Ms. Gonzales on all of the correspondence

5    or emails that I sent out of the office.

6              The only thing that kind of struck me as

7    peculiar is that after that meeting, from then on, when I

8    used to approach Ms. Gonzales or I would see her in the

9    hallway or passing by, I would speak to her and she wouldn't

10   speak to me.  This went on for about three weeks to a month

11   before I want to say she came around and started speaking

12   again.

13             From that point after the information from the

14   COPS office came to me, I started working on the blanket

15   purchase agreement and also the statement of work, ran it up

16   the chain.  I drafted a file and a routing slip to Ms. Gaines

17   and also Ms. Gonzales and lastly Mr. Worthington.

18             When Ms. Gonzales got it, she came to me.  I

19   believe Ms. Gaines had a few edits.  I made those edits and

20   then it went up the chain to Ms. Gonzales.  Ms. Gonzales came

21   around and she asked to meet with me in reference to the

22   material and she had some edits, so she made several edits on

Page 24

1    the actual document itself, and some other things that she

2    was telling me about, I was making notes as to the changes

3    that she wanted made.

4         So I went back and made those changes and added

5    the necessary information that she wanted me to add.  That

6    night or first thing in the morning, I put the file back in

7    her in-box.  Later on that day she came to me and she said

8    that again we meet.  She went through the file and said that

9    these weren't the changes that she had asked me to do.  And I

10   told her that those were the changes that she asked me to do

11   to the best of my ability or my recollection based on what

12   she had wrote on the actual document and the notes that I had

13   taken.

14        So she said, "No, that's not what I asked of

15   you."

16        So I said, "Well, okay, Ms. Gonzales, what are

17   you asking?  What do we need to change or do to fix this?"

18        At that point, she gave me some more.  She made

19   some more edits on the actual document and also I made some

20   notes based on again what I thought that she was asking of

21   me.  Again I went back to my cubicle, made these changes, and

22   I'm not sure whether or not it was the same day or the next

Page 25

1   day, I gave those same changes back to her.  She called me

2   again, saying that that wasn't what she has asked of me.

3            So at that time I was actually confused and I

4   didn't know what to do, so I went to Ms. Gaines and asked Ms.

5   Gaines, based on these incidents would she mind sitting in on

6   the next meeting that I had with Ms. Gonzales to makes sure

7   that I was getting the task that she wanted me to do

8   correctly.

9            She agreed.  Went in and sat down and again Ms.

10  Gaines said nothing.  She was just in there to observe, to

11  listen.  All of the changes that Ms. Gonzales asked me to

12  make, I went and made them, and the document went through

13  finally from Ms. Gonzales up to Mr. Worthington.  It didn't

14  come back to me for any more edits.

15       **Q    So the long and short of it is she had questions**

16  **about your work and you didn't understand what it is she**

17  **wanted you to do and it took three times to get it right?**

18       A    I don't think it took three times to get it

19  right.  Again I've noticed that or I have experience with Ms.

20  Gonzales that a lot of edits that was made on my particular

21  work, would start out one way on how I presented it, would

22  get changed two or three times, yes, and would end up back to

Page 26

1    how I originally submitted the document.

2            The deal is, is -- well, not the deal -- that

3    the problem that I was having understanding was that what it

4    actually was she wanted to do, she insisted that each time I

5    made the required changes that was not what she asked of me.

6    I found that not to be true.

7        Q    Well, I don't really understand this.  I mean

8    you're a supervisor now, aren't you?

9        A    Correct.

10       Q    And people sometimes have to turn in more than

11   one draft, more than one revision; isn't that true?

12       A    Correct.

13       Q    And it seems to me it's a pretty simple thing to

14   say, you know, instead of arguing back and forth that this is

15   what your edit was, you show the person, "Well, this is what

16   your edit was.  See, right here, this is your handwriting."

17       A    Uh-huh.

18       Q    I mean so is that what you did?

19       A    That is exactly what I did.

20       Q    And what did she say?  No, that's not my

21   handwriting?

22       A    Correct -- no -- she said that's not what I

Page 27

1    asked you to do.

2         Q    And so it's in her handwriting.  She has crossed

3    it out and she is telling you that's not she asked you to do?

4         A    Me to do.  That's the main reason why I went and

5    got Ms. Cynthia Gaines.

6         Q    I see.  Let me just back up for a second.  But

7    what is your -- you're a supervisor now?

8         A    Correct.

9         Q    What position?

10        A    I'm now the branch manager   I'm now the manager

11   of the training component.

12        Q    Training.

13        A    Uh-huh.

14        Q    You're not an accountant, are you?

15        A    I am an accountant.

16        Q    You are an accountant?

17        A    Uh-huh.

18        Q    Not a CPA?

19        A    No, I don't have a CPA license.

20        Q    You have a college degree in accounting?

21        A    Correct.

22        Q    When did you get that?

Page 31

1    A    I sure was.  Uh-huh.

2    Q    You were?

3    A    Uh-huh.

4    Q    When were you security guard?

5    A    I was security guard from -- I'm sure of the

6  dates, but I want to say a good year from '95 to '96 before I

7  was hired.

8    Q    I see.  So immediately before you were hired as

9  an accountant, you were actually a security guard at?

10   A    The office of justice programs.

11   Q    The actual building where they were?

12   A    Correct.

13   Q    Oh.  Okay.  So I'm sorry.  So there -- you had

14  this issue and you told Ms. Schwimer about this one time when

15  Ms. Gonzales made you redo those edits two or three times?

16   A    Well, actually I told her about several

17  incident.  That was one.  That was --

18   Q    How long was your meeting?

19   A    With Ms. Schwimer?

20   Q    Yes.

21   A    An hour I want to say.

22   Q    All right.  And what other things did you tell

Page 32

1   **her about?**

2        A       Other things where if I would be on the phone

3   dealing with grantees, Ms. Gonzales would come around to my

4   cubicle, and I would turn around and motion to her that I

5   would come right around to see her.  Apparently I want to say

6   that agitated her because when she came around, she -- when I

7   came around, she told me that I should get off the phone when

8   she comes around.

9            And I explained to her that I was dealing with a

10  grantee that was, you know, having some issues that I was

11  trying to resolve.  This grantee had complained about

12  constantly being passed around.  So I was trying to, you

13  know, deal with the grantee.

14           So she was saying -- so I said, "Well, I don't"

15  -- I told her, I said, "I don't see what the big problem is

16  because when I come around to speak to you and you're on the

17  phone, you don't get off the phone for me.  I go back to my

18  cubicle until, you know, I come back around when you're off."

19           That's when she told me that, well, she was the

20  manager so I was supposed to give her that respect of getting

21  off the phone.

22           Some other things that actually happened with

Page 33

1   her is that she was looking at my work, and she wasn't

2   looking at other staff's work.  Again dealing with grantees,

3   if I had to respond to financial questions, we got a

4   component in the chief financial officer's division known as

5   customer service where we allow grantees to send emails to us

6   on financial questions or problems that they are having.

7          Based on being a trainer or facilitator with the

8   office of justice programs and my knowledge of the agency's

9   rules and regulations, the customer service normally would

10   give me several of the what we call ask OC questions, that

11   they were unable to answer.  So I would research the question

12   to try to get back to the grantee.  Anc, again, before I

13   could send it out, Ms. Gonzales requested that I send them to

14   her for review.

15          Again I would draft up the -- my response, give

16   it to Ms. Gonzales and then from time-to-time, yes, she would

17   make several edits to it.  Then I could send it out.  One of

18   the problems that I really had was in our regional sessions

19   when I open up the sessions.  One of the things that I've

20   always stressed to grantees is that I would get back with

21   them in a timely manner, saying that I would get back with

22   them in 48 hours.

Page 34

1     I noticed that when I'd give Ms. Gonzales my

2    drafts for responses for the grantees, it would be weeks

3    before I would get them back or days.  One time when I

4    finally had to speak up in reference to that is a grantee

5    called with a request for some financial information.  I

6    researched the information, gave it to Ms. Gonzales.

7         This Monday I was due -- actually Tuesday -- I

8    was due to go out of town to do another regional from Tuesday

9    through Friday.  So Monday I approached Ms. Gonzales, asking

10   her where was she with that response, because I was going to

11   be out of the office for the rest of the week.  And she told

12   me she would try to get it to me by the end of the day.  I

13   didn't receive it from her.

14        When I came back in town the next week, a couple

15   of days passed and I confronted Ms. Gonzales about it again.

16   She gave the document to Ms. Gaines and Ms. Gaines gave it to

17   me, saying that I could send it out.  Ms. Gonzales had no

18   changes for it.

19        I want to say it was well over two weeks.  So at

20   that point I told Ms. Gaines that I didn't want to send it

21   out because this was a recurring problem and it contradicted

22   my statements in the regional saying that I would get back

Page 35

1  with the grantee within 48 hours, and clearly this email had

2  sat on her desk or was in her possession for two weeks or

3  better.

4          Slide presentations, one of the things I was

5  speaking about ad hoc training seminars, I would meet with

6  the program office if they wanted us to participate in their

7  program office training.  They would set aside segments of

8  financial trainings for the office of justice programs or the

9  comptroller's office in order to do these.  So based on

10  whatever issues that their grantees were having, I would try

11  to find out what those issues were and then go back and

12  create a slide presentation that addressed those certain

13  issues.

14          Again Ms. Gonzales asked to see those prior to

15  me presenting those at these trainings.  So I would create a

16  presentation.  Give them to Ms. Gonzales.  From time-to-time,

17  she would make changes and I would comment to her that some

18  of the changes that she wanted to make couldn't be made

19  because this particular program office, based on general

20  language that we had in our regional training, this program

21  office solicitation was a little bit more specific so I

22  couldn't change it to the recommendation that she wanted it

Page 36

1   to be changed to.

2           And I'll give you an example.  There are four

3   unique special conditions with the office of justice programs

4   that are standard with all awards regardless of the program

5   office.  Certain program office have other additional special

6   conditions.

7       Q    Let's take a break for a second.  I'm sorry to

8   interrupt.

9       A    Okay.  No problem.

10          (A brief recess was taken.)

11      A    Yeah.  Slide presentations and I -- you know --

12  she would give them back with certain comments made on them

13  that were not appropriate for various types of programs

14  within the office of justice programs.  So I would make those

15  comments to her.  And for the most part, there was no

16  problem.  The only problem is that I started getting the

17  slide presentations back the day before or if it was a local

18  one, the day of the actual training session.  That created a

19  problem because if I was doing a training session for let's

20  just say 60, 70 people, then I had to reproduce these slides

21  and carry them with me in order to give them out to the

22  grantees at the training.

Page 37

1          Being that I just -- I just started asking other

2     staff members was Ada, you know, doing the same things with

3     them, or to them, that she was actually doing with me, and no

4     one that I spoke with ever had to send draft emails or slide

5     presentation.  There was only one other presenter, Angela

6     Pearson.  And I asked her, I said, "Is Ms. Gonzales asking

7     for your slide presentations before you do them?"  And she

8     said no.  She mentioned and I asked her about the emails.

9          So she told me.  She said, "No."  She said,

10    "Mike, based on the meeting, we were just required to cc

11    upper management in reference to everything, not give them

12    copies.

13          So I told them, I said, "Well, you know, every

14    time I do a response to grantees or a slide presentation, Ms.

15    Gonzales is asking to see them before they go out."  And

16    again I didn't have a problem with the request.  It was just

17    that the lag time of getting the information back I had a

18    problem with it didn't agree with what I vowed I wanted to

19    say to grantees on how I would respond back to them in a

20    timely manner.

21          So that was when I spoke up in reference to

22    that.  That was another conversation that I had with Ms.

Page 38

1    Schwimer.  Let me think of anything else.

2              And then just every time I would seek assistance

3    from someone above Ms. Gonzales' grade level, we would go

4    into these nonspeaking modes for, you know, they would vary,

5    a week here, two weeks there, a month, you know.

6              So at one point Travis McCrory was the director

7    at this particular time and at one point, I said, "Well, what

8    can I do in order to alleviate this or, you know, find out

9    what's going on," because I work better if I'm doing

10   something wrong or there's a problem.  I work better if I,

11   you know, approach the person.  Let's try to work it out.  If

12   I'm wrong about something, you know, give me a chance to

13   amend that or whatever the case is.

14             So I went to Mr. Travis McCrory and I asked him,

15   I said, "Would you mine meeting with myself and Ms.

16   Gonzales," I said, "because the air here or the things that

17   we're going through, I just, you know, I don't know what they

18   are.  I'd like to get to the bottom of it, because right now,

19   currently, I'm depressed to come to work.  You know, I come

20   in the door and my whole disposition just goes down because I

21   know what I have to deal with."

22             So he told me, fine, no problem.  And he's held

Page 39

1  a meeting.  We used our conference room, and I went in and I

2  started the meeting.  I told Ms. Gonzales, I said, "Actually

3  I called this meeting.  I asked him here so that we could

4  figure out what's going on."

5          I said, "If I'm doing something, you know, to

6  you, or something that I'm not doing right, you know, I want

7  to use this meeting to air that out.  If there's something

8  I'm doing, let me apologize.  But if I've offended you in any

9  type of way, let me, you know, set the air straight so that

10  we can move forward because, you know, as a team, you know,

11  I'm not feeling that we're working together, you know, for

12  the same mission."

13          She really didn't say anything.  Like I said I

14  apologized for my role in anything that may have been causing

15  this friction.  And she said, "Well, you know, I want us to

16  work together, too."

17          And after the meeting, she left out.  The

18  director left out, and my supervisor was sitting there.  And

19  I said to him, I said, "Ms. Gaines," I said, "even though I

20  want to say I poured my heart out to Ms. Gonzales, trying to

21  figure out what was going on," I said, "I don't feel that

22  anything here was accomplished because she never said

1   anything more than, you know, I want the same thing, too,"

2   you know. And I said, "I apologize.' I said, "I'm going to

3   be honest with you. I was looking for an apology from Ms.

4   Gonzales because I don't believe that the entire problems

5   that we've been experiencing, are all on me. I'll take

6   whatever responsibility for, you know, my share of it, if

7   they're brought to my attention."

8           Nothing was actually brought to my attention.

9   So I said, "Well, you know, I'm not comfortable with this.

10  So I want to go back to Mr. McCrory and ask for another

11  meeting because prior to Mr. McCrory leaving, he said is

12  everything okay. And if not, come see me. If we need to

13  have another meeting, we can do that.'

14          So either the same day or the next day, I went

15  to Mr. McCrory and I told him I just wasn't comfortable with

16  the outcome because I don't feel anything was accomplished.

17  So Mr. McCrory set up another meeting.

18          We came back in the meeting and I had started

19  off again. I told Ms. Gonzales, I said that based on the

20  outcome and the things that transpired I don't feel that we

21  go anywhere with this particular meeting that we had.

22          So I said, "You know, I'm going to be honest

Page 41

1   with you. I was looking for apology from you because I don't

2   feel that this entire problems that we were having are all on

3   me."

4           So she told me, she said, "Well, if all that

5   what you were looking for an apology," she said, "I can do

6   that. We didn't have to have another meeting for that." She

7   said, "I suggest that maybe we go out and have a beer and

8   work things out."

9           So I said, "Okay. Fine." At that point I felt

10  better. I felt better in reference to leaving that

11  particular meeting. We never had a beer, which really isn't

12  a problem, but again they just kept coming as far as little

13  run-ins about things. So at that point I went to Mr. McCrory

14  and I asked Mr. McCrory for a transfer out. I told him I

15  wanted to go over to the monitoring division because I was

16  just too depressed coming to work based on the things that I

17  had to go through.

18          So he explained to me that I couldn't be

19  transferred out because I was a valuable trainer. And he

20  would have a conversation with Ms. Gonzales and the rest of

21  the time that Mr. McCrory was here before he found another

22  job, to be honest with you, I didn't have another problem out

Page 42

1    of Ms. Gonzales until she became acting director and denied

2    the leave request.

3         Q        **So she had problems with your writing; is that**

4    **correct?**

5         A        I would guess so.

6         Q        **And did others?  Did Cynthia Gaines have**

7    **problems with your writing?  Did she consider --**

8         A        I don't want to say problems with the writing.

9    Here's what Ms. Gaines explained to me when I first started

10   doing policy or doing writing for the agency.  She said,

11   "Mike, based on the different levels of approval that a

12   document is going to go through," she said, "I don't want you

13   to take personally any types of edits," she said, "because I

14   have a different writing style from Ms. Gonzales" -- from at

15   that time I think it was Stacey Worthington -- "from Mr.

16   Worthington.  Ultimately it's going to go to Jim McKay and

17   Cindy Schwimer."

18            She said, "What you're going to find is the

19   original document that you propose, based on all the edits,

20   nine times out of ten when it comes back to you, it will

21   probably be pretty similar to how it first was submitted,

22   based on people's writing styles."  So she asked me not to

Page 48

1              MR. KATOR:  Okay.  I have nothing further.

2              MS. JOHNSON:  Just one or two -- a couple of

3    things.  If you could just give us a minute.

4              MR. KATOR:  No problem.

5              MS. JOHNSON:  Okay.

6              (A brief recess was taken.)

7              EXAMINATION BY COUNSEL FOR THE PLAINTIFF

8              BY MS. JOHNSON:

9       Q    I just want to clarify something you said

10   earlier, Mr. Williams.  You had testified that Ms. Gonzales

11   indicated to you at the time of the denial of the request

12   that there was a staffing policy requiring coverage by one

13   trainer and one policy as the basis for denying your leave

14   request; is that correct?

15      A    No.  Well, let me say this   I don't think that

16   I said, and I may have so if I did let me clarify that -- I

17   don't remember saying that she said that there was a policy

18   or that there was a policy in the agency for that particular

19   requirement.  If anything it would have been a division

20   policy, but I was not aware of that.

21      Q    I guess as my question were you aware of what

22   she indicated to you was the basis for the request?

Page 49

1      A      Okay.  No, I was not aware because again with

2  limited amount of facilitators, being myself and Angela

3  Pearson, there were several occasions where based on one of

4  us doing the required to the mandatory monthly regional, and

5  then the request, the multiple requests coming in from the

6  program office.  There were multiple times where Ms. Pearson

7  and myself were out of the office for weeks.  And the only

8  people that were in there were policy people because there

9  were only two trainers.

10      Q      So at that time there wouldn't have been the

11  kind of coverage that she indicated that she sought?

12      A      That she sought.  At that time, no, I was not

13  aware and that hadn't been the policy.

14      Q      Now did Ms. Gaines attend any of the meetings --

15  I'm sorry -- I believe you indicated that Ms. Gaines

16  attended a meeting with you and Ms. Gonzales; is that

17  correct?

18      A      Correct.

19      Q      How many meetings did Ms. Gaines attend?

20      A      Ms. Gaines, I want to say attended several.

21  Whenever there was a meeting that I knew about when she said

22  she wanted to meet with me, I would go get Ms. Gonzales -- I