# EXHIBIT 16

BEFORE THE
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

- - - - - - - - - - - - - - - - x
                                :
ADA GONZALES,                   :
                                :
              Complainant,      :  EEOC No. 100-
                                :    2003-08223X
        v.                      :
                                :  Agency No.
ALBERTO GONZALEZ, ATTORNEY      :   JP-0203
GENERAL, DEPARTMENT OF JUSTICE, :
                                :
              Agency.           :
- - - - - - - - - - - - - - - - x

                    EEOC Washington Field Office
                    Suite 200
                    1400 L St., N.W.
                    Washington, D.C.  20005

                    Monday, April 11, 2005


        THE HEARING in the above-entitled matter

commenced at 9:15 a.m., pursuant to notice.


BEFORE:

        GLADYS COLLAZO, Administrative Law Judge


**Diversified Reporting Services, Inc.**
1101 Sixteenth Street, NW  Second Floor
Washington, DC  20036
(202) 467-9200

23

1 with?

2   A No.  I mean, there -- issues.  I say issue and

3 I bring it up now, because it's been brought up in the

4 case.  There was an incident with an employee that

5 complained that I didn't allow him to have a day off.

6   Q You're referring to Ms. Schwimer's deposition?

7   A Yes.

8   Q And which employee are you --

9   A A gentleman by the name of Michael Williams.

10   Q And what happened with Michael Williams?

11   A He went to the supervisor and requested to --

12 requested a day off.

13   Q Who was his supervisor?

14   A Cynthia Gaines.  She reported to me.  And she

15 came to me and explained the situation to me and said

16 that she had told Michael that he could not have the

17 day off, because we had been very short staffed and we

18 had a lot of projects going on and deadlines and we

19 could not afford to allow him that day off.  And I

20 supported her decision.

21   But before I actually spoke to Mike, I went to

22 the deputy comptroller, Jim McKay, and to Maureen

24

1    Smythe, who was a special assistant to Cindy Schwimer,

2    and I wanted to be sure that, you know, we were doing

3    the right thing.  And I spoke with Jim and with Maureen

4    and they both agreed with the fact that we could not

5    let Michael go.

6           And so then I said to Mike that he could go if

7    he could trade, if he could work out an arrangement

8    with another employee who was already scheduled to be

9    off and if he could trade with another employee.

10   Q    So you told me he could have leave if he could

11   find someone else to work in his shift?

12   A    Yes.

13   Q    And then what happened?

14   A    I was called by the comptroller to her office,

15   and she spoke to me and said that Michael had come to

16   her about the day off and that I was to -- I was

17   telling him that he couldn't have the day off.

18   Q    And did she ask you why you had denied him the

19   day off?

20   A    The whole conversation -- if I can call it a

21   conversation; she really was the only one that spoke --

22   it was so quick.  She was standing, I walked in, there

35

1    because she was in that job -- at the time I had

2    already done that.  In addition, at the time that I

3    applied I had, what, two and a half years of experience

4    in Training and Policy Division doing a lot of

5    training, developing presentations, you know, training

6    presentations, conducting presentations nationwide, in

7    English and Spanish, and I had written, developed,

8    worked on many, many policies and procedures which, you

9    know, by its name is Training and Policy Division.

10   That's what we were about.  Plus a number of other

11   projects that we did in the division.

12        Q    Who was the selecting official for that

13   position?

14        A    Cynthia Schwimer, the comptroller.

15        Q    And were you interviewed for that position?

16        A    No.

17        Q    Do you know if you were on the cert list for

18   that position?

19        A    Yes.

20        Q    You were on the cert list?

21        A    Yes.

22        Q    Do you know if anyone else was interviewed for

36

1   that position?

2      A   No.

3      Q   You don't know?

4      A   Yes, I know that no one else was.  I was told

5   -- I believe Jerry Conty, Maureen Smythe, were also on

6   the cert, and Joanne Suttington.  And it's my

7   understanding that Jerry Conty and Maureen Smythe were

8   not interviewed, nor was I.  I later learned that

9   Joanne Suttington was.

10      Q   What do you mean, you later learned Ms.

11   Suttington was?

12      A   I learned during some of the proceedings that

13   Ms. Suttington testified that she had been interviewed.

14      Q   Are you referring to Ms. Suttington's

15   deposition?

16      A   Yes.

17      Q   So you learned from Ms. Suttington that she

18   had been interviewed for the position --

19      MS. BURKE:  Objection.  Deposition testimony

20   is not in the record in this case.

21      JUDGE COLLAZO:  But that's how she learned it

22   and that was the question.  I will allow it.

73

```
 1              JUDGE COLLAZO:  Your witness.

 2              MR. COOLEY:  Thank you, Judge.

 3                   DIRECT EXAMINATION

 4              BY MR. KATOR:

 5      Q    Would you just state your name for the record,

 6   please?

 7      A    Patricia Ann Cuffee.

 8      Q    And, Ms. Cuffee, where do you currently work?

 9      A    Department of Justice, Office of Justice

10   Programs.

11      Q    And within that, where are you?

12      A    The Office of the Comptroller, Training and

13   Policy Division.

14      Q    Okay.  And what's your job in Training and

15   Policy Division?

16      A    Financial Training and Policy Specialist.

17      Q    What grade is that?

18      A    13.

19      Q    Is that a supervisory position?

20      A    No.

21      Q    Okay.  How long have you been with OJP?

22      A    Twenty -- about 27, 28 years.
```

74

1        Q     And how do you know Ms. Gonzales?

2        A     As a supervisor/manager with the -- second-

3    line supervisor and manager within the Office of the

4    Comptroller.  She was previously a second-line

5    supervisor.

6        Q     Well, let me ask you.  Have you had -- have

7    you been supervised by Ms. Gonzales in the past?

8        A     As a second-line supervisor, not as a direct

9    supervisor.

10       Q     When was that, what periods?

11       A     I guess about two years ago, or maybe --

12   whatever time she was assigned to the Training and

13   Policy Division.  I don't know the exact dates.

14       Q     You've been in TPD the whole time?

15       A     The whole time of what?

16       Q     Well, the past -- since 2000 you've been in

17   TPD?

18       A     Since 2000?  I can't tell you the exact date

19   that I came to TPD.  I've been in the Office of the

20   Comptroller the entire time, but I was previously in

21   another division.

22       Q     Which division was that?

75

1      A     The Financial Management Division.

2      Q     Okay.  When Ms. Gonzales was your second-level

3  supervisor, who was the intermediate supervisor?

4      A     Cynthia Gaines.

5      Q     Okay.  And did you interact with Ms. Gonzales

6  on a regular basis?

7      A     Yes, I interact with her.  Now, when you say

8  regular, what do you mean, regular?

9      Q     Well, how often did you interact with her?

10     A     As often as necessary, you know, as a second-

11  line supervisor.

12     Q     What were your impressions of Ms. Gonzales as

13  a supervisor?

14     A     I had good impressions of her as far as the

15  second-line supervisor.  She was available when I

16  needed to meet with her if I had questions.  And she

17  gave assignments, she gave instructions as to what

18  needed to be done and the time frame and what should

19  need to be accomplished.

20     Q     Did you find that she was conscientious?

21     A     Yes.

22     Q     Was she hard-working?

76

1    A    Yes.

2    Q    Did you think that she was -- that she treated

3    her employees fairly?

4    A    As far as I know, yes.  She treated me fairly.

5    Q    Did you ever have to interact with her on --

6    ask her to have a leave or anything of that nature?

7    A    Not really, because my leave, we go through my

8    direct supervisor.  And if there were, you know, any

9    questions there, I guess my direct supervisor would

10   address that.

11   Q    Yeah.  I guess I was going to ask if you could

12   just explain how that works.  How is leave requested?

13   A    Through the first-line supervisor, direct

14   supervisor.

15   Q    And then how would it get elevated, if at all?

16   A    The direct supervisor would take it to the

17   manager or director if needed, but it's usually

18   approved at the first level.

19   Q    And you never had any interactions with Ms.

20   Gonzales where you had to ask her for leave?

21   A    I'm not going to say never, because I cannot,

22   you know, really go back to saying that I never did

1    something during that period of time.  If I did, it

2    would've been a situation where the direct supervisor

3    was not available, such as on leave.  So, perhaps I

4    did.

5         Q    Okay.  But you never recall any issues with

6    respect to --

7         A    No, I don't recall any issues as far as having

8    leave disapproved.

9         Q    Are there any specific interactions that you

10   recall with Ms. Gonzales as your supervisor?

11        A    What do you mean?

12        Q    Well, just things that you could tell us,

13   specific instances where she demonstrated to you her

14   availability or her giving out instructions and --

15        A    Oh, no, she was available, always available.

16   If there was some reason why she wasn't available, she

17   will let me, you know, such as another meeting -- you

18   know, conflicting schedule.  But she was always

19   available when I needed to meet with her.

20        Q    And with respect to giving instructions and

21   telling you what the time frames were, how did she do

22   that?

78

1        A    Either verbally and/or follow up with email

2   confirmation, or either I would do that.  There would

3   always be some type of confirmation that we understood

4   each other.

5        Q    Did you ever observe Ms. Gonzales trying to

6   facilitate a resolution of an issue with employees or

7   other employees?

8        A    Not that I recall, that I, you know, really

9   pay any attention to.

10       Q    Okay.

11            MR. KATOR:  Pardon me just for a minute,

12  Judge.

13            BY MR. KATOR:

14       Q    Just clarify, Ms. Cuffee, very briefly.  Were

15  you employed in TPD during that period of time when Ms.

16  Gonzales was the acting director?

17       A    Yes.

18       Q    When was that, do you recall?

19       A    The exact date, no, I don't recall.  Whatever

20  that period was, whether it was 2002 or 2003, I don't

21  recall the exact date.

22       Q    Okay.  How many people did she supervise at

79

1    that time?

2         A    When you say did she -- whether or not Ada

3    supervised, you mean as directly or as the director of

4    the division?

5         Q    Well, why don't you tell -- let's start with

6    director of the division.

7         A    Okay.  As director of the division, I believe

8    at that time we probably had -- well, there were two

9    managers, and one manager I believe had four staff

10   people, and Cynthia, my supervisor, had seven or eight

11   at that time.  I believe someone may have left or we

12   got another person, seven or eight.

13        Q    Do you recall, was there much going on in that

14   period of time when she was acting branch manager -- or

15   division director?

16        A    What do you mean, much going on?

17        Q    Were there big projects that you all were

18   working on that you can recall?

19        A    We always have big projects.

20        Q    The briefing book, or the --

21        A    Yes, that's routine.  Our projects are always

22   big and our projects many times are rushed.

80

1       Q     Financial management guide.  Is that one that

2   may have been --

3       A     That's one of the bigger projects, yes.

4       Q     Okay.  What to your observation was her

5   ability to handle many tasks at the same time?

6       A     As far as I could see, her ability there.

7   I mean, we managed to get the task accomplished as far

8   as I know within the time frame that we had to meet.

9       Q     Did you feel that she was someone you could go

10  to for guidance?

11      A     Yes.

12      Q     And with respect to her management style, was

13  -- how did she -- did she -- I coach a soccer team and

14  sometimes I yell at the kids and sometime I praise.

15            What was her style in that respect?

16      A     She definitely gave praise when we

17  accomplished our goals.  She also identified when we

18  got closer to that time frame, wanted to know whether

19  or not there was a problem.  You know, she just didn't

20  want to be caught off guard, so to speak, at the last

21  minute.  So, she asked for periodic updates.

22      Q     What was her -- how did she respond to

81

1    problems that arose?

2        A    She addressed them.  Can you be more specific

3    when you say problems that arose?

4        Q    Well, I think you had mentioned that she

5    didn't want to be surprised and she was always trying

6    to keep up to date, that she didn't want to be

7    surprised by problems that might come up.  And I was

8    just curious as to how she would deal with them when

9    you --

10       A    Depending on what it was -- and I can only

11   speak for me, you know -- she would let me handle it

12   independently; or if she felt it had gotten to the

13   point that she needed to intervene, she would do that

14   by meeting with me as well as the office that was

15   involved with it.

16       Q    Was she able to communicate well with you and

17   with other staff members?

18       A    Yeah.  My problem was not -- as far as I'm

19   concerned, the problem that I've had as far as my

20   assignments was not with other staff members.  I work

21   with other offices within OJP, and it was crucial that

22   we had to meet certain deadlines in order to meet the

**Diversified Reporting Services, Inc.**
1101 Sixteenth Street, NW  Second Floor
Washington, DC  20036
(202) 467-9200

96

1      A    Next to Conty it says Hispanic male, and

2   Gonzales, Hispanic female.  That printing.

3      Q    And what is this document?

4      A    This is the promotion candidate list, or what

5   we call the cert.

6      Q    Is that what you -- when you said you received

7   a cert list, is that the document?

8      A    Yes, absent that writing, yes.

9      Q    When did you receive the candidate -- or

10  promotion candidate list?

11     A    About July 16th.

12     Q    Prior to receiving the cert list on about July

13  16th, did you know who had applied for this position?

14     A    No, I did not.

15     Q    Vacancy announcement had a closing date of

16  June 18th.  Do you know why it took almost a month for

17  the cert list to make it to your office?

18     A    No, I do not know.

19     Q    When did you know that Ms. Gonzales had

20  pursued EEO activity against Mr. McCrory?

21     A    Before this.  I'm not exactly sure of the

22  date.

98

1    Q    In the entire time that you have been

2    comptroller, Ms. Gonzales and Ms. Suttington worked

3    under you?

4    A    Yes, that's correct.

5    Q    When you received this list, promotion

6    candidate list, was it accompanied with anything, or by

7    anything?

8    A    Yes.  It had all of the applications as well.

9    Q    What did you do once you got the list and the

10   applications?

11   A    I did a cursory review of the applications and

12   made a selection.

13   Q    Who did you select?

14   A    Joanne Suttington.

15   Q    Did you discuss this selection with anyone

16   before you made it?

17   A    Not that I recall.

18   Q    Did you interview any of the candidates?

19   A    No, I did not.

20   Q    Why not?

21   A    I don't generally interview candidates that I

22   know, and OJP-wide candidates generally are known to

101

1      had to overturn.  And this is an employee that you

2      would have to work with, and this is also an employee

3      that never comes to me at all with any issues, so it

4      was rather amazing that he would come to me about an

5      issue that he had with her.  It was my impression that

6      he was speaking in general terms about other issues

7      that other staff under her supervision also had.  And I

8      just didn't have that kind of input from Joanne's

9      people.

10             JUDGE COLLAZO:  Mr. Cooley?

11             MR. COOLEY:  Thank you, Judge.

12             BY MR. COOLEY:

13       Q     You said that Ms. Suttington is more coachable

14      than Ms. Gonzales.  What do you mean by that?

15       A     When I say coachable, I mean flexible, more --

16      quicker to take more direct guidance in terms of taking

17      their own initiative and not requiring as much hand-

18      holding, if you will.

19       Q     I believe you also said that she was more

20      responsive -- Ms. Suttington was more responsive to

21      needs.  What did you mean by that?

22       A     It was my belief that she -- and based on my

107

1          MR. KATOR:  Objection.

2          JUDGE COLLAZO:  Yes.  I know you're waiting.

3   I'm just writing my own notes.

4          MR. KATOR:  I'm just teasing, I'm just

5   teasing.

6          (Pause)

7          JUDGE COLLAZO:  Mr. Kator, your witness.

8          MR. KATOR:  Thank you, Judge.

9                    CROSS EXAMINATION

10         BY MR. KATOR:

11     Q    Ms. Schwimer, let me start with, I believe you

12   testified that you did not know who had applied for the

13   position?

14     A    That's correct.

15     Q    Okay.  And you also testified today that you

16   did not interview anybody for the position?

17     A    That's correct.

18     Q    And you stated that to the -- in your

19   affidavit to the EEO investigator, is that correct?

20     A    I believe that's correct.

21     Q    Okay.  You are aware, I take it, that Joanne

22   Suttington says that she was interviewed for the

109

1      A    I'm not --

2           MR. COOLEY:  Objection.

3           JUDGE COLLAZO:  I will allow it.  It is a

4  characterization, it's her opinion.

5           Okay, you can answer.

6           THE WITNESS:  I'm sorry, your question again?

7           BY MR. KATOR:

8      Q    The question is, if Ms. Suttington said under

9  oath that she was interviewed by you in her office,

10  that she was -- that she would be mistaken if she said

11  that?

12      A    That I interviewed her in her office?

13      Q    In your office.

14      A    Oh, in my office?

15      Q    Yes.

16      A    I don't recall that at all.

17      Q    Well, are you saying now that you just don't

18  recall whether you interviewed Ms. Suttington for the

19  position?

20      A    I did not interview anybody for the position.

21      Q    Including Ms. Suttington?

22      A    Correct.

114

1      A    I don't recall the exact specifics except that

2  there was a leave issue, that she had ruled a certain

3  way on a leave issue and I had to overturn it, because

4  her rationale was not reasonable to me.

5      Q    Is that all you can recall about that?

6      A    That's all I recall.

7      Q    Was Ms. Gonzales Mr. Williams' direct

8  supervisor?

9      A    Ms. Gonzales was the acting director for the

10 Training and Policy Division at that time.

11     Q    Would that have made her his direct

12 supervisor?

13     A    I believe there was a person between the two,

14 yes.

15     Q    Who would that have been?

16     A    I believe that was Cynthia Gaines.

17     Q    And what was Cynthia Gaines' role in this

18 leave issue?

19     A    I'm not certain.  I don't recall.

20     Q    Well, did she approve the leave?

21     A    I don't recall.  The issue that came to my

22 attention was not about Cynthia, it was about Ada.

147

1      Q    Okay.  And that was February 12th, 2004, is

2  that correct?

3      A    I don't recall the exact date.

4      Q    Okay.  Let me just ask you, just start asking

5  the questions and we'll go from there.

6           You were appointed to -- in August of 2002 to

7  the position of, what, Director of Training and Policy

8  Division?

9      A    Correct.

10     Q    Okay.  When did you apply for that position?

11     A    June 18, 2002.

12     Q    And were you interviewed for that position?

13     A    Hello?

14     Q    I'm sorry.  My question was, were you

15  interviewed for that position?

16     A    I did have a discussion with Cindy after I

17  applied, maybe like a week or so later.

18     Q    Okay.  So, just for point of clarification,

19  she was aware then that you had in fact applied for the

20  position in June of 2002?

21     A    Personnel apparently sent my resume to her.

22     Q    Well, let me just back up and just ask you

148

1    about your previous answer, because you said you met

2    with her in June of 2002 to talk about the position, is

3    that correct?

4         A    That's correct.   That was after the point of

5    me applying for the position.

6         Q    Okay.   When were you interviewed?

7         A    I'm not sure if it was interview.   It was a

8    discussion about the position.   And all I know, it was

9    like a week or so later.   I was in her office

10   discussing another matter, and then she said, by the

11   way, do you have a few minutes.   And so then she said,

12   I notice you applied for the position, and we just had

13   some discussion about the position itself, and that was

14   it.   It was probably like a 3-minute or so

15   conversation.

16        Q    Okay.   Do you -- I realize that you're not

17   wanting to call it an interview right now, but you --

18        A    Well, it could be an interview.   It depends on

19   who's looking at it, whether it's informal -- matter of

20   an interview is probably subjective.   We talked about

21   the position, that's basically what I'm saying.

22        Q    Okay.   In your mind, at least, it was an

149

1    interview, is that correct?

2        A    Right.  I have had interviews where people

3    called me and just asked me to verify my name.  I

4    perceive that as an interview, because I have applied

5    for a position that I was interested in and they were

6    interested in me.

7        Q    Okay.  So --

8             MR. COOLEY:  Judge, sorry to interrupt.  I'm

9    having a lot of trouble hearing -- Can we get the

10   volume up just a little?

11            JUDGE COLLAZO:  Ms. Suttington, you said you

12   talked about the position, and what else did you say?

13            THE WITNESS:  That was just basically it.  We

14   had talked about -- I was in her office -- I'm trying

15   to speak.  And I was in her office discussing another

16   matter, work related, and I'm not sure of the nature of

17   that at this time.  But then after our discussion, then

18   she asked me if I had a few minutes, and she said she

19   had my application on her desk, and we basically just

20   had a -- probably like a 3-minute conversation about

21   the position.

22            BY MR. KATOR:

150

1     Q     What else do you recall about the interview?

2     A     That's basically it.

3     Q     Did she say anything to you about the

4     importance or need for having a CPA?

5     A     No, she didn't.

6     Q     Do you recall -- I'm sorry, you may have

7     answered this.  Do you recall how long the interview

8     lasted?

9     A     Oh, all I could say, it was only minutes,

10    maybe three.  I am not sure exactly.

11    Q     And I believe -- well, let me ask.  Do you

12    recall how it was set up?

13    A     Well, it was informal.  I was in her office on

14    something else discussing a different matter

15    altogether, and then she said to me, by the way, I have

16    your -- something of that sort -- by the way, I have

17    your application on my desk; I'd like to talk to you

18    about it for a few minutes if you have a few minutes.

19          And that's all it was, like that.  So it

20    wasn't like she pre-arranged or anything like that, and

21    I'm not sure why I was in her office, but I know it was

22    work related and we were talking about something else.

151

1      Q    Okay.  And are you sure that this was before

2    the selection was made?

3      A    Oh, yeah.  It was before the selection was

4    made.

5           MR. KATOR:  I have nothing further, Judge.

6           BY MR. KATOR:

7      Q    Thank you very much, Ms. Suttington.

8           MS. BURKE:  Yes.  I do have one question,

9    Judge.

10                  CROSS EXAMINATION

11          BY MS. BURKE:

12     Q    Joanne, can you hear me?

13     A    Yes, I can.

14     Q    You just mentioned that this conversation took

15   place before the selection was made?

16     A    Right.

17     Q    How do you know when the selection was made?

18   How could you be sure --

19     A    Oh, I don't know that.  I'm sorry.  I don't

20   know that.  I thought you meant before they offered me

21   the job.  When he said before the selection was made,

22   it was before I was officially offered the job.  That's

**Diversified Reporting Services, Inc.**
1101 Sixteenth Street, NW  Second Floor
Washington, DC  20036
(202) 467-9200

152

1    all I know.

2            MS. BURKE:  No more questions.  Thank you,

3    Judge.

4                    REDIRECT EXAMINATION

5            BY MR. KATOR:

6        Q    Do you recall the date of that interview?

7        A    No, I don't.

8        Q    Okay.

9            JUDGE COLLAZO:  That's it?

10           MR. KATOR:  I just want to establish when it

11   was.

12           BY MR. KATOR:

13       Q    Was it in June of 2002?

14       A    Yes, it was in June of 2002.

15       Q    Okay.

16           MR. KATOR:  Thank you, that's it, Judge.

17           JUDGE COLLAZO:  Ms. Suttington, thank you so

18   much for your testimony here.  I know it's your day

19   off.  I ask you that you do not comment with anybody

20   about your testimony here today.

21           THE WITNESS:  Okay.

22           JUDGE COLLAZO:  Thank you so much, you're

1     Q    How would you describe Ms. Gonzales'

2 managerial style?

3     A    Let's see.  I would describe her style as

4 fully involved, mentoring, very positive, not -- not

5 like a dictator, but more bringing us in and asking for

6 our help and empowering us.

7     Q    Is she fair to employees?

8     A    Oh yeah, absolutely.

9     Q    And how is she at multi-tasking?

10     A    I think she's very good.  We have -- in our

11 division we're always reacting, so she's able to stop

12 what she's doing and work on whatever is needing

13 priority at the moment, and then go back to what she

14 was doing without any problems.

15     Q    How does she approach problems, how does she

16 address problems?

17     A    Well, I think she first determines if there is

18 a problem and what kind of result is necessary, and

19 then, you know, works back from there.

20     Q    How does she hold herself accountable?

21     A    I believe she takes responsibility.  She

22 doesn't blame staff.  I mean, no matter whose fault it

1    is, it's always on her shoulders and she doesn't push

2    any blame down.

3         Q    Do you have an example of that?  A time she's

4    done that?

5         A    Do I have an example of that?  I'm thinking.

6    Well, I know she always gives us credit where credit is

7    due.  For example, if there's a job well done, she

8    doesn't sit there and say, you know, it was her work.

9    She, you know, acknowledges that the staff did the

10   work.

11        Q    And what would you say her best skill as a

12   supervisor is?

13        A    Being a human being and treating the workers

14   like we do the work and that we're human, not just

15   drones.  I mean, she -- our staff, I mean, we're

16   dedicated to her.  I want to do a good job because

17   she's my supervisor.  She doesn't -- my last supervisor

18   was very demoralizing.  No matter what work product we

19   would turn in or I would turn in, it was never right.

20   Ada is the opposite.  She looks for the positive and

21   goes from there.  She doesn't humiliate us; she

22   empowers us.